**Y.S.K. CONSTRUCTION CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 93–738.

United States Court of Federal Claims.

Feb. 18, 1994.

450

Tarrant H. Lomax, Washington, DC, for plaintiff.

Christopher R. Yukins, with whom were Asst. Atty. Gen. Frank W. Hunger, David M. Cohen, and Thomas W. Petersen, Washington, DC, for defendant.

## OPINION

BRUGGINK, Judge.

This bid protest action is before the court following a hearing on the merits. Plaintiff asserts that the government has breached its implied-in-fact contract to consider plaintiff's bid fairly and honestly. It contends that the Small Business Administration (SBA), in derogation of statute and regulation, refused to determine whether the low bidder on a contract set aside for Small Disadvantaged Businesses (SDB) actually was an SDB. Defendant asserts that the SBA rightly declined to determine the low bidder's SDB status. The court concludes that SBA wrongly refused to adjudicate fully YSK's protest. It remands plaintiff's protest to the SBA in order that it fully consider it.

*BACKGROUND*

Plaintiff filed this action protesting the potential award of two contracts for roofing work at Ft. Meade, Maryland, DAKF27–93–B–0010 and DAKF27–93–B–0011 by the Army to the low bidder, Maple/Vatica Joint Venture (Maple/Vatica). On September 21, 1993, the Army determined that Maple/Vatica was the low bidder, and YSK was the second-lowest bidder, on both contracts.

The Army had designated these contracts as 100% set-asides for SDBs. *See* 48 C.F.R. 219.502–2–70 (1993). This set aside was authorized pursuant to section 1207 of the Defense Authorization Act, Pub.L. No. 99–661, 100 Stat. 3816 (1987) (codified as amended at 10 U.S.C. § 2323 (Supp. IV 1992) (hereinafter section 1207)), which sets as a target for minority contractor participation 5% of certain DOD contract funds. Section 8(a) of the Small Business Act, Pub.L. No. 85–536, § 8(a), 72 Stat. 384, 389 (1958) (codified as amended at 15 U.S.C. § 637(a) (1988)), defines SDB [1] as a small business owned by socially and economically disadvantaged individuals. "Socially disadvantaged individuals are those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." 15 U.S.C. § 637(a)(5) (1988). Such individuals are also "economically disadvantaged" if "diminished credit and capital opportunities" have impaired "their ability to compete in the free enterprise system." 15 U.S.C. § 637(a)(6)(A). The Act also further defines requirements as to size, ownership percentage, and special status for certain groups. *See* 15 U.S.C. § 637(a)(4).

On September 21, YSK filed a protest with the Contract Officer (C.O.), contending that the Army should not award the contracts to Maple/Vatica because it was not an SDB. In accordance with statutes and regulations that direct such protests to SBA, the C.O. forwarded the protest to SBA. *See* 15 U.S.C. § 636(j)(11)(F)(vii); 48 C.F.R. § 219.302–70. On September 24, SBA's Assistant Regional

1. The term SDB is used under the section 1207 program to refer to "small business concerns ... owned and controlled by socially and economically disadvantaged individuals." Under SBA's section 8(a) program, such concerns are called "section 8(a) contractors." This opinion uses the term SDB to refer to contractors under both programs.

Administrator for Procurement Assistance in Philadelphia denied the protest. SBA apparently mistook it for a size protest, as it described the protest as such in dismissing it.

The C.O. once again forwarded the protest, this time clarifying its nature. On November 3rd, the Director of the Division of Program Certification and Eligibility refused to adjudicate the protest. SBA stated that its policy was to not examine the SDB status of joint ventures as a whole:

> [T]he Department of Defense has not established regulations for evaluating the eligibility of joint ventures for SDB set-asides and bid preferences. In the absence of such eligibility criteria, it is currently the policy of SBA, in the case of a joint venture, to limit its SDB eligibility determination to the purported SDB participant in such a joint venture, provided that there are sufficient, specific grounds to challenge the SDB eligibility of those participants. It is the responsibility of DOD to make determinations regarding the SDB eligibility of joint venture offerors.

The SBA noted that it does examine the SDB status of the SDB component of a joint venture, but that in this instance YSK's protest lacked specificity with regard to Maple Construction, the SDB component of Maple/Vatica.

After the C.O. forwarded this decision to YSK, it filed an appeal with the Associate Administrator for Minority Small Business and Capital Ownership Development (AA/MSB & COD). On December 8, 1993, the AA/MSB & COD upheld the decision. She restated SBA's policy on determining the SDB status of joint ventures:

> SBA's position is that . . . it requires the guidance and direction of DOD related to the basic eligibility requirements of SDB bidders which take the form of joint ventures. . . . On December 1, 1992, the DOD published proposed rules defining an SDB joint venture. However, these regulations have not been published as final rules and adopted by DOD. Until the final rules are adopted, SBA does not have a legal basis to perform SDB eligibility reviews of the joint venture relationship.

SBA's refusal to act prompted the C.O. to do so. On December 22, 1993, she issued two decisions adjudicating the joint venture status of Maple/Vatica. She found that Maple/Vatica as a whole qualified for SDB status for each of the contracts.

On December 6, 1993, YSK filed this action, protesting SBA's refusal to adjudicate its protest. At issue here is whether Congress intended SBA or DOD to be responsible for determining the SDB eligibility of joint ventures. The contract was set aside pursuant to DOD's section 1207 program, which sets contract goals for minority participation in government contract work. For its definition of SDB, the section 1207 program incorporated by reference the definition used by the already-existing section 8(a) SBA minority contractor program.

### DOD's Section 1207 Program

In 1987, Congress enacted section 1207, entitled "Contract Goal for Minorities," which set a 5% goal for minority participation in DOD contract work. Congress created the section 1207 program to increase minority participation in defense contracting above the existing levels already fostered by SBA's section 8(a) program for minority-owned small businesses. Maj. Robert L. Ackley, et al., *Recent Developments in Contract Law—1987 in Review,* 1988 Army Law. 3, 4–5 (Feb.).

Section 1207(a) states that:

[A] goal of 5 percent of the amount [of DOD contract funds] shall be the objective of the Department of Defense . . . for the total combined amount obligated for contracts and subcontracts entered into with—

(1) small business concerns, including mass media and advertising firms, owned and controlled by socially and economically disadvantaged individuals (as such term is used in section 8(d) of the Small Business Act (15 U.S.C. 637(d) and regulations issued under that section), the majority of the earnings of which directly accrue to such individuals;

(2) historically Black colleges and universities; and

(3) minority institutions (as defined by the ... Higher Education Act of 1965....).

10 U.S.C. § 2323. Thus, the section 1207 program takes its definition of eligibility from already-existing statutory programs. It relies on regulatory standards promulgated by other agencies, rather than directing DOD to create its own standards. Specifically with regard to minority businesses, it relies on the SDB definition promulgated by SBA under its section 8(a) program. This statutory scheme further relies on SBA's expertise in defining SDB status, as it gives SBA authority over all protests regarding SDB status. 15 U.S.C. § 636(j)(11)(F)(vii).

*SBA's Small Disadvantaged Business Program*

■ Section 8(a) of the Small Business Act sets forth a program that grants assistance to certain minority-owned small businesses. *See* Pub.L. No. 85–536, § 8(a), 72 Stat. 384, 389 (1958) (codified as amended at 15 U.S.C. § 637(a) (1988)). Under this program SBA aids participants, which are known as section 8(a) contractors or SDBs by helping them to obtain and perform government contracts. The program's purpose is to foster the development of SDBs into economically viable firms capable of competing without special assistance. 15 U.S.C. §§ 631(d)(2), 631(f)(1); *Harris Systems Intern., Inc. v. United States,* 5 Cl.Ct. 253, 255 (1984); S.Rep. No. 1070, 95th Cong., 2d Sess. 16, reprinted in 1978 U.S.Code Cong. & Admin.News 3835, 3850. To enter the program, a business must obtain certification from SBA of SDB status. While a business is a participant, SBA monitors its status and progress, *see* 13 C.F.R. 124.111, and provides various forms of assistance, *see* 15 U.S.C. § 636(j). After a prescribed period, its participation ends, and the business graduates from the program. 13 C.F.R. § 124.110. SBA also has the statutory duty to "decide protests regarding the status of a concern as a disadvantaged concern" under any program that employs SBA's definition of SDB. 15 U.S.C. § 636(j)(11)(F)(vii).

One of the ways in which SBA assists participants is through a section 8(a) contract. 15 U.S.C. § 637(a). Under a section 8(a) contract, SBA contracts with a federal agency to provide goods or services or to perform construction work. 15 U.S.C. § 637(a)(1)(A). In turn, SBA subcontracts the actual performance to a program participant. 15 U.S.C. § 637(a)(1)(B). SBA further assists the SDB in performing the subcontract by providing financial, technical, and managerial support. 15 U.S.C. § 636(j)(10).

■ SBA does not certify joint ventures as section 8(a) contractors. Its regulations state that "[a] concern which is owned in whole or in part by another business concern and relies on the disadvantaged status of that concern is ineligible" for SDB status. 13 C.F.R. § 124.109. Thus, joint ventures are ineligible for the continuing, beneficial relationship with SBA embodied by the section 8(a) program. Nevertheless, SBA will allow a section 8(a) contractor to enter into a joint venture, if necessary, to perform a specific 8(a) contract. *See* 13 C.F.R. § 124.321. SBA does not, however, describe that joint venture itself as a section 8(a) contractor. *Id.*

*Relationship Between DOD's § 1207 Program and SBA's § 8(a) Program*

The DOD regulations that implement the section 1207 program reflect that section's reliance on SBA for defining SDB status. Under the regulations, SDBs receive various preferences.[2] Contractors seeking SDB benefits must make a representation as to their SDB status. *See* 48 C.F.R. 219.301 (1993). They do so by referring to the solicitation provision, 48 C.F.R. 252.219–7000, entitled "Small disadvantaged business concern representation." This provision directs the contractor to 13 C.F.R. section 124 (SBA's section 8(a) program regulations) for its definition of SDB. If the contractor's representation raises doubt as to SDB status, the C.O. must protest it to SBA, *id.* § 219.301(b), which then makes a determination of SDB

**2.** For example, a contracting officer may designate the procurement as a small disadvantaged business set-aside, as was the case here. *See* 48

C.F.R. 219.502–2–70 (1993). Such a designation allows only SDBs to bid on the contract. *Id.*

status. In some instances, the C.O. need not file a protest if the contractor represents that it is a participant in SBA's section 8(a) program, or if it certifies that SBA has, within the last six months, determined that it is an SDB. *Id.* § 219.301(b)iii(A)–(B). Furthermore, another offeror, the C.O., or SBA itself may protest a contractor's SDB status. *Id.* § 219.302–70. SBA adjudicates these protests as well. *Id.* SBA's determination of SDB status is conclusive. *Id.* § 219.302–70(f); *see also C & J Service,* 88–2 Comp. Gen.Proc.Dec. ¶ 280 (refusing GAO review of an SBA SDB status determination under section 1207 because SBA has conclusive authority to make SDB determinations); *Arbor Landscaping, Inc.,* 88–1 Comp.Gen.Proc.Dec. ¶ 564 (same). Thus, the regulations defer to SBA for the definition of SDB and the individual application of this definition, leaving no substantive role for DOD.

In practice, SBA generally has accepted the role that DOD's section 1207 regulations assign to it, with one important exception. When SBA has received SDB status protests regarding joint ventures, it has refused to adjudicate the SDB status of the joint venture as a whole. *See, e.g., C & S Carpentry Services, Inc.,* 93–2 Comp.Gen.Proc.Dec. ¶ 209; *SamCorp General Contractors,* 91–1 Comp.Gen.Proc.Dec. ¶ 198; *O.K. Joint Venture,* 90–1 Comp.Gen.Proc.Dec. ¶ 170. Instead, it examines only the alleged SDB component of the venture. *See, e.g., C & S Carpentry Services, Inc.,* 93–2 Comp.Gen. Proc.Dec. ¶ 209. SBA justifies this policy by asserting that it does not have the authority to determine the SDB eligibility of joint ventures. *O.K. Joint Venture,* 90–1 Comp.Gen. Proc.Dec. ¶ 170. Rather, SBA asserts that DOD must make this determination because it requires a statutory interpretation by the agency that administers the statute. *Id.* SBA contends that DOD, not SBA, is this agency. *Id.*

In November 1989, DOD issued a general policy statement purporting to find that joint ventures are eligible to participate in the section 1207 program as SDBs. It has not, however, issued specific guidelines as to how joint ventures would satisfy SDB require-

ments. SBA refuses to act until DOD does so.

DOD has stepped into the breach created by SBA's inaction. Because SBA has refused to determine the SDB eligibility of joint ventures, DOD has done so as a matter of necessity. *See C & S Carpentry Services, Inc.,* 93–2 Comp.Gen.Proc.Dec. ¶ 209; *Sam-Corp General Contractors,* 91–1 Comp.Gen. Proc.Dec. ¶ 198; *O.K. Joint Venture,* 90–1 Comp.Gen.Proc.Dec. ¶ 170. Also, DOD recently has proposed rules that set out requirements for the contents of joint venture agreements that create section 1207 bidders. *See* 57 Fed.Reg. 56,895 (Dec. 1, 1992).

This state of affairs is the subject of the bid protest that plaintiff has brought before this court. It claims that SBA's refusal fully to adjudicate Maple/Vatica's SDB status is contrary to law and that DOD's finding that Maple/Vatica is an SDB is arbitrary and capricious.

*DISCUSSION*

*Standard of Review*

 Under 28 U.S.C. 1491(a)(3), this court may grant declaratory and injunctive relief in bid protest actions filed before award of the contract. *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1374 (Fed. Cir.1983) (en banc). The court takes jurisdiction over cases seeking such relief under precedent that reads into the government's invitation to bid a promise to consider all responsive bids fairly and honestly. *Id.* at 1368; *Keco Industries v. United States,* 192 Ct.Cl. 773, 780, 428 F.2d 1233 (1970); *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 69, 140 F.Supp. 409 (1956); *McMaster Const. Inc. v. United States,* 23 Cl.Ct. 679, 682 (1991). The submission of a responsive bid by a responsible bidder creates an implied-in-fact contract. *John C. Grimberg Co.,* 702 F.2d at 1368; *Keco Industries,* 192 Ct.Cl. at 780, 428 F.2d 1233. Thus, the court views bid protests as claims that the government has breached its promise to consider the plaintiff's bid fairly and honestly.

 In determining whether a breach occurred, this court has limited power to review the government's actions. This court

may find a breach only if the government's actions were arbitrary and capricious, *International Mailing Sys. Div. of Better Packages, Inc. v. United States,* 6 Cl.Ct. 762 (1984), or if they constituted a "clear and prejudicial violation of an applicable statute or regulation," *McMaster,* 23 Cl.Ct. at 682; *see CACI, Inc. v. United States,* 719 F.2d 1567, 1574 (Fed.Cir.1983); *Essex Electro Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 280 n. 3 (1983), *aff'd,* 757 F.2d 247 (Fed.Cir. 1985). If the court finds that the government committed a breach under these standards, it may grant damages, or declaratory or injunctive relief. *See Southwest Marine, Inc. v. United States,* 4 Cl.Ct. 275, 279 (1984).

In the instant case, plaintiff claims that defendant has breached its implied-in-fact contract on two grounds. First, plaintiff claims that defendant acted in violation of law when SBA refused to determine Maple/Vatica's SDB status. Plaintiff also claims that the determination that DOD made in the wake of SBA's refusal to do so was arbitrary and capricious. Plaintiff seeks injunctive relief, asking the court to remand its protest to SBA with an order to determine Maple/Vatica's joint venture status, or to overturn DOD's decision as arbitrary and capricious. Because the court finds that SBA should have determined Maple/Vatica's SDB status, it need not address plaintiff's second ground for relief.

*Who Determines the Definition of SDB?*

■ In setting a "Contract goal for minorities," P.L. No. 99–661, § 1207, 100 Stat. 3973 (1986) (section heading), Congress did not create a definition of "minority" solely for purposes of this goal. Instead, it chose to import classifications from existing programs. DOD may meet the goal by contracting with minority-owned small businesses or with historically black colleges and minority institutions. For the definition of minority-owned small business, Congress re-

ferred to the Small Business Act. For the definition of the other classifications, Congress referred to the Higher Education Act.

Specifically, Congress described the businesses eligible to participate in the section 1207 program as:

> small business concerns, including mass media, owned and controlled by socially and economically disadvantaged individuals ([as such term is used in] section 8(d) of the Small Business Act (15 U.S.C. 637(d)) and regulations issued under such section), the majority of the earnings of which directly accrue to such individuals.

P.L. No. 99–661, 100 Stat 3973 (1986).[3]

Section 1207's reference to the already-existing SBA statute and regulations indicates that Congress did not intend to define a new class of minority-owned small businesses. The phrase "small business concerns ... owned and controlled by socially and economically disadvantaged individuals" is taken entirely from the Small Business Act. *See* 15 U.S.C. § 637. The Act and the regulations in existence at the time that Congress enacted section 1207 defined every word contained in that phrase. By this time, SBA had extensive experience in applying this statutory term, and had promulgated an extensive body of interpretive rules, codified at 13 C.F.R. § 124. Thus, Congress presented DOD with a ready-made, definite class of potential contractors.

Congress' incorporation of such a well-defined term in section 1207 indicates that it did not intend to delegate to DOD the authority to promulgate rules defining SDB status. Congress long ago had delegated that authority to SBA. Section 1207's reference to both SBA's statute and regulations indicates that Congress intended DOD to accept the definition of minority-owned small business already in place. Nothing in the language or structure of the statute indicates that Congress delegated to DOD the authori-

---

3. The bracketed language is taken from the amended version of § 1207, codified at 10 U.S.C. § 2323 (1988). The original language read "as defined by ... 15 U.S.C. 637(d)." P.L. No. 99–661, § 1207, 100 Stat. 3973 (1986). The legislative history does not indicate the reason for this change. The most likely reason is that subsection (d) does not actually define the term "small

business concerns ... owned and controlled by socially and economically disadvantaged businesses." Instead, it uses that term with reference to definitions contained elsewhere in § 637. Thus, the phrase "as used in" provides clearer direction as to the meaning of the phrase. The court attaches no significance to the change beyond that clarification.

**456**

ty to interpret or deviate from that definition. Thus, Congress divided authority between the two agencies: SBA provides DOD with the definition of the beneficiaries of this contract goal, and DOD determines how to direct more contracts toward them.

Congress later made this division of responsibility more explicit in the Business Opportunity Development Reform Act of 1988, Pub.L. No. 100–656, 102 Stat. 3853 (codified at 15 U.S.C. § 636). In that Act, it created within SBA a Division of Program Certification and Eligibility, which bears the responsibility for

> decid[ing] protests regarding the status of a concern as a disadvantaged concern for purposes of any program or activity conducted under the authority of subsection (d) of section 637 if this title, or any other provision of Federal law that references such subsection [section 8(d) of the Small Business Act] for a definition of program eligibility.

*Id.* § 201 (codified at 15 U.S.C. § 636(j)(11)(F)(vii)). Under this section, SBA adjudicates all protests regarding SDB eligibility, including those arising from the section 1207 program.

Thus, the structure of the statutory program reveals that the power to interpret the term "small business concerns … owned and controlled by socially and economically disadvantaged individuals" is wholly and exclusively within the sphere of SBA's authority. When Congress delegates the authority to interpret a statutory mandate to an agency, the agency usually can choose between two modes of interpretive lawmaking—rulemaking or adjudication. *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 292–94, 94 S.Ct. 1757, 1770–72, 40 L.Ed.2d 134 (1974); *SEC v. Chenery Corp.,* 332 U.S. 194, 201–03, 67 S.Ct. 1575, 1579–80, 91 L.Ed. 1995 (1947). *See generally* David L. Shapiro, *The Choice of Rulemaking or Adjudication in the Development of Administrative Policy,* 78 Harv. L.Rev. 921 (1965). Here, Congress has dele-

gated the power to perform both modes to SBA. Through general rulemaking, or through ad-hoc, case-by-case determinations, SBA is to determine which businesses fit into the statutory classification. The assignment of both of these roles to SBA leaves no room for DOD to play a substantive part in making this specific policy determination under the section 1207 program. *See Southwest Marine, Inc. v. United States,* 4 Cl.Ct. 275 (1984) (holding that Congress did not authorize Navy to second-guess SBA's size determination under another DOD small business set-aside program that assigns SBA the authority to define eligibility and adjudicate protests).

DOD is, therefore, without power to address whether joint ventures are SDBs. Accordingly, it acted beyond the scope of its authority when it issued the November 1989 policy letter purporting to determine that joint ventures are eligible to participate in the 1207 program as SDBs. Likewise, SBA should not have requested guidance from DOD on this issue, as DOD did not have the power to answer the request.[4]

■ The court finds that SBA has both the power and the duty to define the bounds of the phrase "small business concerns … owned and controlled by socially and economically disadvantaged individuals." It has discretion in choosing whether to perform this function on a general or ad-hoc basis, *see Chenery,* 332 U.S. at 203, 67 S.Ct. at 1580 (stating that this choice "lies primarily in the informed discretion of the administrative agency"), but it does not have the discretion to abdicate this function entirely, *Allison v. Block,* 723 F.2d 631 (8th Cir.1983). Furthermore, SBA specifically has the duty to "decide protests regarding the status of a concern as a disadvantaged concern." Congress assigned this function to SBA without qualification. Accordingly, SBA should have decided plaintiff's protest. SBA acted contrary to law in refusing to do so and in attempting to

---

4. Also, DOD's proposed rules on SDB status for joint ventures appear to intrude on SBA's exclusive authority to define SDB status. Although these rules are not before the court because DOD has not yet adopted them, the court takes notice of the fact that they purport to define a joint venture as an SDB if it meets certain requirements. In this respect, DOD's joint venture rules differ from SBA's joint venture regulation, 13 C.F.R. § 124.321. SBA's regulation does not define joint ventures as SDBs.

defer to DOD's judgment on whether joint ventures fall into the statutory classification. SBA must decide plaintiff's protest, and it must fulfill its duty to define SDB eligibility.

The C.O.'s attempt to adjudicate plaintiff's protest is, therefore, without legal effect. The court recognizes that SBA's inaction forced the C.O. to act, and that her actions certainly were understandable. Nevertheless, DOD did not have the power to act under these circumstances.

Defendant argues that placing the responsibility for defining SDB status in SBA's hands could frustrate congressional intent in implementing section 1207's 5% goal. Congress is eager to see this contract goal met, *see* H.Rep. No. 527, 102d Cong., 2d Sess. 262–66, *reprinted* in 1992 U.S.Code.Cong. & Admin.News 1636, 1686–90, and defendant's counsel has represented that DOD is under tremendous pressure to do so. In light of these circumstances, SBA is reluctant to force a policy judgment upon DOD. Defendant argues that exercises of interpretive authority that set policy for a program are best left to the agency that Congress has charged with implementing that program.

In *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991), the Supreme Court recognized that an important factor in determining which agency possesses interpretive lawmaking power is whether an agency is in the best position to assess the impact of its interpretation on implementation, *see id.* at 152–53, 111 S.Ct. at 1176–77. Normally, that agency is the one that executes the statute. *See id.* That result usually obtains, however, because that particular agency is the one with "historical familiarity and policy-making expertise." *Id.* at 153, 111 S.Ct. at 1177. On the specific issue of which businesses qualify as SDBs, SBA is the agency that possesses the greatest experience and expertise. Furthermore, in *Martin* the Court emphasized that its determination that the Secretary of Labor was the proper interpreter of the Occupational Safety and Health Act ultimately rested on "the available indicia of legislative intent." *Id.* at 157–58, 111 S.Ct. at 1179–80. In this instance, all such indicia point toward SBA having the sole power to determine which agencies fall into the statutory classification.

Defendant further argues that DOD should define eligibility because regulations governing SBA's section 8(a) program imperfectly mesh with the intent of the 1207 program. Section 8(a) contractors have a continuing and intimate relationship with SBA. Accordingly, it determines their eligibility to participate on a program-wide, long-term basis. Section 1207, in contrast, operates on a contract-by-contract basis. Defendant claims that this difference makes certain aspects of SBA's regulations inapplicable to the section 1207 program.

Congressional intent on this matter is, however, clear. The definition of an SDB should travel consistently, and in its entirety, from SBA's program, to DOD's program. The court emphasizes, however, that section 1207's adoption of SBA standards is limited to the concept of "small business concerns ... owned and controlled by socially and economically disadvantaged individuals." On the limited point of whether a business falls into the category defined by those words, the programs overlap completely. In other respects they may be widely different. For example, DOD allows contractors to self-certify as to their SDB status. SBA allows a contractor to participate in the 8(a) program only after SBA verifies its eligibility. These procedural differences are perfectly legitimate. In each instance, however, the substantive standard must be the same, and SBA must be the final arbiter of that standard.

The limited role accorded to SBA by Congress leaves DOD with many resources to meet the goal set by Congress. Congress has presented DOD with a class of beneficiaries defined by SBA. Subject to other provisions of law, DOD is free to determine how it shall provide the intended benefit to that class. DOD has broad discretion in determining how to fulfill this mandate. *Commercial Energies, Inc. v. United States*, 929 F.2d 682, 685, 686 (Fed.Cir.1991). The only tool denied to it is the power to redefine the class of beneficiaries. The court's decision here leaves DOD with many options. The court notes that its holding leaves open the issue of

458

whether DOD can fulfill its mandate by allowing SDBs to participate in a joint venture to perform a DOD contract. What DOD definitely cannot do is presume to define that joint venture as an SDB. Only SBA has that power.

### Chevron Deference

Defendant also contends that the court owes deference to SBA's interpretation of the relevant statutes. Defendant asserts that SBA reasonably determined that neither 10 U.S.C. § 2323 nor 15 U.S.C. 636(j) granted it the power to determine whether joint ventures are eligible to participate in the section 1207 program as SDBs. Defendant contends that the court should defer to SBA's interpretation of these statutes and find that it therefore acted in accordance with law.

The principle of judicial deference to an agency's statutory interpretation is well-established. Under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and its progeny, if a court encounters an ambiguity or gap in a statute, it defers to the reasonable interpretation of the agency charged with administering the statute, *see id.* at 843.

Before a court can perform a *Chevron* analysis, however, it must be certain that it is addressing an interpretation made by an agency with authority to interpret the statute. Usually a court can assure itself that the agency satisfies this predicate by determining that Congress has delegated to the agency broad authority to administer the statutory program. One of the rationales for Chevron deference is that when Congress delegates authority to administer a statute, it also delegates as a necessary incident the authority to make any decisions necessary to fill any gaps or ambiguities in that statute. *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2781–82. In most cases, an agency's authority to interpret a statute is never in dispute, as Congress obviously has assigned all significant responsibility for the statutory program to one agency. *See, e.g., Public Citizen Inc. v. Federal Aviation Admin.,* 988 F.2d 186, 191 (1993) (stating, without analysis, that Congress committed the Airline Security Improvement Act of 1990 to the FAA's administration).

In some instances, however, a court cannot so easily assume that Congress delegated interpretive lawmaking power to an agency. In examining some programs, a court cannot rely on a broad delegation of administrative responsibility because Congress has assigned responsibilities to more than one agency or required cooperation among agencies. *See, e.g., Suramerica de Aleaciones Laminadas, C.A. v. United States,* 966 F.2d 660, 665 & n. 6 (Fed.Cir.1992) (addressing interpretation of the Tariff Act, which both the Department of Commerce and the International Trade Commission administer). In other cases, interpretive authority may be at issue because Congress has divided the power to enforce a statute between agencies. *See, e.g., Martin,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991) (addressing a program in which Congress assigned the power to enforce to the Secretary of Labor, and the power to adjudicate to the Occupational Safety and Health Review Commission). Where a court addresses such a statute, it must first ascertain whether the agency in question possesses interpretive authority.

If this question is the court's central inquiry, its analysis does not fall within the *Chevron* framework at all. The answer to this question is instead a predicate to *Chevron* review, and as such not a proper subject of deference. Giving deference to an agency in such a circumstance would beg the question. Instead, the court must perform a searching analysis to determine Congress' intent on the matter. *See, e.g., Martin,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117. In the instant case, the central inquiry is whether Congress has charged DOD or SBA with the responsibility of defining SDB status. Essentially, defendant's position is that the court should defer to SBA's determination that it does not have the authority to interpret section 1207's SDB provisions. If the court were to accept this assertion, it would further conclude that, because SBA had no authority to interpret that portion of section 1207, the court should not defer to SBA's determination that section 1207 grants it no interpretive authority. This paradox highlights the reason why def-

erence is inappropriate with regard to such questions.

Even if the court were to shoehorn this case into a *Chevron* analysis, the court would not merely defer to SBA's interpretation as defendant suggests. The *Chevron* analysis is a two-step process. *See Nuclear Info. Resource Serv. v. Nuclear Regulatory Comm'n,* 969 F.2d 1169, 1173 (D.C.Cir.1992) (en banc) (summarizing the analysis); Hon. Laurence H. Silberman, *Chevron—The Intersection of Law & Policy,* 58 Geo.Wash.L.Rev. 821, 823 (1990). A court must first determine whether a gap or ambiguity exists in the statute. *Nuclear Info. Resource Serv.,* 969 F.2d at 1173. Deference is appropriate only if it answers the first question affirmatively. *Miller v. Department of the Army,* 987 F.2d 1552, 1555 (Fed.Cir.1993); *Glaxo Operations UK Ltd. v. Quigg,* 894 F.2d 392, 398 (Fed. Cir.1990). Even then, the court will only defer to the agency's interpretation if it is reasonable or permissible. *Nuclear Info. Resource Serv.,* 969 F.2d at 1173.

In this case, the statutory language is clear; Congress left no ambiguity or gap with regard to which agency determines SDB status under the section 1207 program. As discussed above, Congress created a statutory scheme in which SBA clearly has the responsibility for deciding questions of SDB status. This court must comply with the intent of Congress, notwithstanding any contrary interpretation by SBA.

## CONCLUSION

The court finds that SBA's interpretation of the relevant statutes was incorrect. Congress entrusted SBA with the responsibility of determining SDB status. SBA's refusal to do so constituted a violation of law prejudicial to YSK. SBA is the agency in which Congress has vested the responsibility to create uniform SDB policies and which has the expertise and authority to apply those policies. As such, SBA is the only agency that can provide YSK a fair and proper hearing of its protest. By depriving YSK of a fair and proper hearing, the government breached its implied-in-fact contract to consider YSK's bid fairly and honestly.

The most appropriate remedy in this case is to remand YSK's protest to SBA for full adjudication. This court may grant injunctive relief pursuant to 28 U.S.C. § 1491(a)(3). It also has "the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just." 28 U.S.C. § 1491(a)(2).

The court remands this case to SBA's Director of the Division of Program Certification and Eligibility and orders that she determine the SDB status of Maple/Vatica Joint Venture as a whole. The method used to make this determination is a matter for SBA to decide.

SBA's decision must set forth its rationale with clarity, and must be justifiable on that basis. *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 1577–78, 91 L.Ed. 1995 (1947). It must also be rational and properly founded in the statutory authority granted by Congress. *Id.* at 207, 67 S.Ct. at 1582. The court expects that to meet this standard, SBA will need to address 15 C.F.R. § 124.109. Plaintiff has argued forcefully that this section is dispositive of the issue here. The court does not, of course, prejudge this issue. SBA is the best interpreter of its own regulations. *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986); *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965). It must, however, offer a reasonable interpretation of them. *Northern Indiana Pub. Serv. Co. v. Porter County Chapter of Izaak Walton League,* 423 U.S. 12, 15, 96 S.Ct. 172, 173, 46 L.Ed.2d 156 (1975). The court expects that SBA also may need to address the statutory basis of its own regulation on joint ventures, 13 C.F.R. § 124.321.

SBA shall make this determination by March 15, 1994. It is so ordered.