**NUTECH LAUNDRY & TEXTILE, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 03–401C.**

United States Court of Federal Claims.

June 9, 2003.*

---

Brian A. Darst, Fairfax, VA, for plaintiff.

Ada E. Bosque, U.S. Department of Justice, Washington, DC, with whom were Robert D. McCallum, Assistant Attorney General, and Director David M. Cohen, for defendant.

* ORIGINAL ORDER FILED UNDER SEAL ON APRIL 28, 2003

## ORDER REMANDING TO AGENCY

FIRESTONE, Judge.

This case concerns a pre-award bid protest filed under 28 U.S.C. § 1491(b)(4). The plaintiff, Nutech Laundry & Textile, Inc. ("Nutech"), objects to the denial of award and withdrawal of Request for Proposal ("RFP" or "solicitation") No. CC–02–07. The RFP was for laundry services at the Warren Grant Magnuson Clinical Center for the Department of Health and Human Services, National Institutes of Health ("NIH" or "government"). The RFP was set aside for small businesses, but NIH decided to withdraw the RFP and proceed with an unrestricted, full and open competition. Nutech argues that the withdrawal of the RFP fails to follow the applicable regulations, and that the contracting officer's ("CO's") decision not to award Nutech the contract is arbitrary, capricious, or otherwise not in accordance with the law.

For the reasons that follow, the court concludes that this case must be **REMANDED** to NIH in order for NIH to conduct an appropriate Independent Government Cost Estimate ("IGE") and re-evaluation of Nutech's proposal. The plaintiff's April 14, 2003 cross-motion for summary judgment is hereby **GRANTED** to the extent provided for in this order. The defendant's March 14, 2003 motion for judgment on the administrative record is hereby **DENIED**. NIH is **ENJOINED** from finalizing its decision to withdraw the subject RFP until it completes these tasks and provides the court with copies of both its revised IGE and re-evaluation decision.

## BACKGROUND

### A. Facts

On April 29, 2002, the NIH issued solicitation number RFP–CC–02–07, a small business set-aside, seeking to procure a requirements contract for industrial laundry and garment cleaning services. The RFP covered a variety of facilities in various locations within Maryland and required offers to contain unit pricing for three bulk linen laundry

services and eighteen other garment services. The RFP included one fixed-price requirements contract for one year and four one-year option periods. The RFP received North American Industry Classification System 812332 "Industrial Launderers," which required the offerors to have an average annual revenue of less than $10,500,000 per year for the preceding three years.

Before issuing the RFP, NIH endeavored to improve its laundry service cost. To this end NIH hired Victor Kramer Co., Inc., a laundry-linen management consultant, to conduct a linen study ("Kramer study"). The Kramer study found that NIH paid an average of .92 cents per pound on its current contract held by Nutech. The consultant advised NIH that Nutech's price was "exorbitant by any standard." Administrative Record ("AR") 132.[1] The study recommended that NIH:

> [R]evise its procurement practices to assure some degree of meaningful competition ... or look for an alternative to the traditional solicitation of commercial laundry service, or consider the construction and operation of its own laundry.
>
> By our reckoning, NIH could construct its own plant for $3 million and operate it at a savings of $585,000/year (37%) relative to its current service contract. If it can revise its procurement practices to attract market-prevalent pricing, the savings could be even more dramatic.

AR 132. The study estimated that by using an in-house organization the unit operating cost (per clean-lb) would be $0.578 as compared to the current unit laundry service cost of $0.922 (per clean-lb). AR 136.

NIH also conducted a market survey to determine if using a small business set-aside was appropriate for laundry services. On October 27, 2000, NIH conducted an initial market survey to which five companies responded. NIH pursued negotiations with a responsive nonprofit agency that was a "preferred source of supplies and services" under the Javits–Wagner O'Day Act. On February

8, 2002, that agency was ultimately found to not have the capacity to perform. NIH thereafter conducted a new market survey on February 12, 2002. Two companies, besides Nutech, the incumbent contractor, provided capability statement responses. Only one of those companies adequately responded to the posted questions. Based on Nutech's and the responsive company's submissions, the CO concluded that "competitory requirements were satisfied to remain within the small business set aside arena." AR 553. NIH did not, however, collect any price information as part of this survey.

In advance of issuing the RFP, NIH prepared an IGE. The one-page IGE describes appropriate contract pricing as: Basic Contract Period $977,151.76; First Option Period $1,006,466.31; Second Option Period $1,036,660.30; Third Option Period $1,067,760.11; and Fourth Option Period $1,099,792.91. AR 554–55. For purposes of comparison, the IGE provided that the appropriate estimated price to be $0.32 cents per pound for bulk linen. The IGE does not contain any backup documentation, descriptive parameters or explanatory notes.

Armed with the consultant's report, market survey and the IGE, the CO released the RFP, advising offerors that the award would be made based upon "best value." NIH received two proposals in response to the RFP, one from Nutech and one from Tartan Textile Services, Inc. ("Tartan").

Nutech's proposal included services for a proposed price of: Basic Contract Period * * * * *; First Option Period * * * * *; Second Option Period * * * * *; Third Option Period * * * * *; and Fourth Option Period * * * * *, for a total of * * * * *. AR 360. The costs were estimated to be * * * * * cents per pound for bulk linens during the basic contract period. AR 361. In the alternative, Nutech proposed a weekly fixed price flat rate of * * * * *, for the first year, increasing yearly by * * * * * increments, for a total of * * * * *. AR 307.

---

1. The Kramer study referenced "Appendix One" for certain cost analyses performed as part of the study. The government could not locate Appendix One, and therefore that portion of the document is not a part of the Administrative Record before this court. As a consequence the basis for Kramer's conclusion regarding Nutech's present price is unsupported.

Tartan submitted a proposal on May 29, 2002. Tartan's offer included services for a proposed price of: Basic Contract Period * * * * *; First Option Period * * * * *; Second Option Period * * * * *; Third Option Period * * * * *; and Fourth Option Period * * * * *, for a total of * * * * *. AR 463. These proposed estimates equaled * * * * * cents per pound for bulk linens during the basic contract period. AR 464.

NIH found both Nutech and Tartan to be in the competitive range. Nutech received a score of * * * * * points for its technical proposal and a score of * * * * * points for its business proposal. AR 585. Tartan received a score of * * * * * points for its technical proposal and a score of * * * * * points for its business proposal. *Id.* In the CO's statement of facts prepared for the protest, he described why both bidders, with such varying costs, made it into the competitive range: "The rationale for including Nutech in the competitive range was that Nutech is currently providing the services and there needed to be an assessment as to whether Tartan's costs were actually realistic." AR 4.

NIH questioned Tartan's price and requested a revision and clarification. Tartan submitted a revised offer, accompanied by a cost analysis in response to NIH's questions. In its revised offer, Tartan offered; Basic Contract Period * * * * *; First Option Period * * * * *; Second Option Period * * * * *; Third Option Period * * * * *; and Fourth Option Period * * * * *, totaling * * * * *. AR 556. The revised proposal was based on a unit price of * * * * * cents per pound for bulk linens. AR 556a.

Nutech was advised in a June 28, 2002 letter that "the proposal costs appear to be excessive." AR 26. On July 3, 2002, Nutech submitted its revised prices. Specifically, Nutech offered to provide the procured services for a proposed price of: Basic Contract Period * * * * *; First Option Period * * * * *; Second Option Period * * * * *; Third Option Period * * * * *; Fourth Option Period * * * * *, totaling * * * * *. AR 39. Nutech's revised offer was based on a unit price of * * * * * cents per pound for bulk linens. Nutech also revised its weekly fixed price flat rate to * * * * *, for the first year, increasing yearly by * * * * * increments, totaling * * * * *. AR 39.

Following its analysis, NIH chose Tartan, and advised Nutech via letter on July 23, 2002. NIH also informed Nutech that no further revisions to its proposal would be considered "unless a basis exists to challenge the small business size status" of the awardee. AR 65.

On July 24, 2002, Nutech protested Tartan's size to the SBA. Nutech argued that Tartan:

> does not qualify for a small business set-aside under controlling SBA regulations.... IT SHOULD HAVE BEEN CLEAR FROM THE DATA SUBMITTED by TARTAN ... THAT THEY DID NOT QUALIFY.... [T]he proposal submitted by Tartan [should] be declared ineligible for this solicitation since Tartan is legally not eligible to receive a small business setaide contract.... Further, it is very clear that Tartan is using its size to overwhelm small laundries ... by grossly underbidding small business set aside contracts.

AR 68. Tartan responded to Nutech's protest on August 6, 2002 by admitting that it did not qualify as a small business:

> [W]e have determined that Tartan is in fact not a small business as defined under the Small Business Administration's size regulations under this procurement. When I completed the [proposal], I believed that our operation in Front Royal, VA was operating as a subsidiary of our parent company and therefore, met the requirements of a small business.... I did list the pertinent information regarding our parent company. I had no intention to hide information and no reason to not complete the bid in a truthful and honest manner.

AR 574. On August 7, 2002, based on Tartan's concession, the SBA sustained Nutech's size protest, finding that Tartan "is other than small." AR 572.

Consequently, on September 18, 2002, NIH re-opened negotiations with Nutech, the only remaining offeror. NIH re-iterated

that Nutech's costs were considered excessive "based on the competitive market." *Id.* NIH asked Nutech to reconsider its price because "at [its] current proposed pricing, the determination of fair and reasonable pricing cannot be made.... If you decide that your cost will remain unchanged state your position and rationale in the correspondence." AR 153.

By letter dated September 23, 2002, Nutech stated that "[i]t is our firm belief that all of our bids, as previously submitted and modified, have been FAIR AND REASONABLE." AR 156. However, Nutech proposed a different "best and final" offer only for their fixed weekly pricing alternative. Nutech proposed a price of * * * * * per week with * * * * * escalation, for a total of * * * * *. AR 157, 162.

During this time, Nutech also held a contract with the National Naval Medical Center ("NNMC"). The unit prices Nutech charged to the NNMC for linens ranged from * * * * * cents per pound to * * * * * cents per pound. AR 881. On September 20, 2002, Nutech submitted information on this contract to the CO, comparing it to the RFP.

The CO examined the information submitted by Nutech and compared the work required by the NNMC contract to the work required by the RFP in order to better understand the price differences. The RFP required that the contractor process an estimated 1.5 million pounds per year. The NNMC contract, awarded in 1997, showed that Nutech processed quantities estimated to range from 1.3 million pounds during the base year to approximately 2 million pounds during each of the first four option years. The CO concluded that this amount was similar to that required by the current RFP. The NNMC statement of work provided that "laundry will be clean, dry and free of lint and objectionable spots, stains and odor" and free from known pathogenic organisms. The CO also found this language to be similar to that in the RFP: "The contractor shall wash and process the government owned linen and return it free of soil, stains, and pathogenic agents." AR 178. The CO determined that both the NNMC contract and the current

RFP required that the process chain ensure that there is no contact between soiled and processed linens.

The CO also reviewed the follow-on NNMC contract, which he did not consider to be substantively different from the original NNMC contract or the RFP. Consequently, the CO did not agree with Nutech's contention that the work required by NNMC and NIH were substantively different to justify the differences in price.

On September 23, 2002, the CO advised the NIH Small Business Office that NIH would like to pursue an unrestricted, full and open competition because Nutech's price could not be found to be reasonable. The CO determined that using a full and open competition "would be more feasible for competitiveness of the marketplace." AR 745. On September 24, 2002, the NIH small business specialist and the SBA procurement center representative concurred with the decision by signing a standard form that provided the reason as "[n]o reasonable expectation of obtaining 'two or more' offers from small businesses concerns providing products of small businesses." AR 748.

Without knowing that the CO requested to pursue an unrestricted, full and open competition, Nutech, on October 29, 2002, met with the CO to discuss Nutech's price proposal and its differences in interpretation of various items. Nutech insisted that the contract work under the NNMC contract and the RFP were sufficiently different in nature to merit the cost difference. Nutech insisted that it was pricing the contract based on experience, that it had a deeper understanding of what the contract required beyond the items listed in the RFP. Nutech's proposal contained additional line items that "were purposely deleted from the new requirement." AR 7. In particular, Nutech argued that operating room ("OR") scrub handling; buffer pads, mops, gloves; floor mats and flags; OR scrubs shrink wrapped; pressing of lab coats; Child Inn items; cubicle curtains; and table linen were all items included in NIH's bulk-linen price, but were not included in the NNMC contract. The CO represented that if these items were deleted from consideration, Nutech's price would

come down to * * * * * for the basic contract period, from Nutech's proposed * * * * *. This would amount to a potential savings of * * * * *. AR 7.[2] Nutech's new price still remained above the IGE and Tartan's price.

On November 19, 2002, the CO advised Nutech that NIH would not award a contract upon the solicitation. Instead, the CO advised Nutech that it planned to conduct an unrestricted, full and open competition, justifying its move with FAR 19.506(a).[3] The CO wrote that "[t]he Government believes that your pricing is in excess of a fair market price.... The government does not agree that your rationale for the variance in proposed pricing versus market pricing is adequate justification to award a contract." AR 20–21.

On December 2, 2002, Nutech, acting *pro se*, filed a protest of that decision with the General Accounting Office ("GAO"). Nutech argued that the NIH decision to withdraw the solicitation is "arbitrary and capricious, in violation of 5 U.S.C. Section 706, and all of the applicable Federal Acquisition Standards." AR 11. Nutech "request[ed] that the [GAO] order that contract to be awarded to Nutech." *Id.* Nutech charged that the withdrawal of the RFP is "suspect" and that the consultant contracted to study laundry services for NIH was really a "wolf in sheep's clothing," committed to thwarting Nutech's bidding chances. AR 11–12. Nutech argued that "there are inconsistencies in the statement of work compared to the real work to be done. These gaps been have [sic] common practice at NIH for a long time." AR 12.

The CO responded to the GAO protest. He explained that his decision to cancel the small business set-aside was based upon four factors: 1) Tartan's price, even though that

offer was non-responsive; 2) Nutech's unit price for the NNMC contract; 3) the Kramer study; and 4) the IGE. The CO response demonstrated that Nutech's unit price was almost double the IGE, Tartan's unit price, and the NNMC unit price. In this connection, the record showed that 1) Tartan's revised total price was approximately * * * * * the IGE, and 2) Nutech's revised total price was approximately * * * * * the IGE and * * * * * Tartan's total price.

On February 10, 2003, the GAO dismissed the protest, finding the CO's decision to cancel the solicitation reasonable. The GAO stated that "[a] procuring agency has broad authority to cancel a solicitation issued under negotiated procedures and need only establish a reasonable basis for cancellation." B291,739, 2003 CPD ¶ 34 at 4, 2003 WL 282208 (citing *Bahan Dennis, Inc.*, B–249496.3, 1994 WL 82030, March 3, 1994). The GAO has "found cancellations proper where the protester's price exceeded the government estimate by as little as 7.2 percent." *Id.* (citing *Building Maint, Specialists, Inc.*, B–186441, 1976 WL 9755, Sept. 10, 1976). Additionally, the GAO stated that "[s]ignificantly, Nutech does not specifically challenge the reasonableness of this government estimate." *Id.*

The GAO determined that "[because] Nutech's price was more than 50 percent above the government estimate, we think the agency could reasonably conclude Nutech's price was excessive based on this analysis alone." Decision 4. Furthermore, the GAO found that "[b]ased upon our review of the record, we do not think that Nutech's explanation of performance distinctions between the NIH and [NNMC] efforts adequately justify why Nutech's proposed NIH unit pricing was almost double that of the [NNMC]." *Id.* at 5.

---

**2.** Nutech disputes this conclusion and contends that some of these items were in fact the subject of the RFP, such as the OR scrubs.

**3.** FAR 19.506(a) states:

If, before award of a contract involving a small business set-aside, the contracting officer considers that award would be detrimental to the public interest (e.g., payment of more than a fair market price), the contracting officer may withdraw the small business set-aside determi-

nation whether it was unilateral or joint. The contracting officer shall initiate a withdrawal of an individual small business set-aside by giving written notice to the agency small business specialist and the SBA procurement center representative, if one is assigned, stating the reasons. In a similar manner, the contracting officer may modify a unilateral or joint class small business set-aside to withdraw one or more individual acquisitions.

Finally, the GAO dismissed Nutech's claim that the incumbent contractor's proposed price is *per se* reasonable, citing FAR § 15.404–1 that states such a price " 'may' be considered 'if both the validity of the comparison and the reasonableness of the previous price(s) can be established.' " *Id.*

## B. The Present Litigation

The plaintiff then filed its bid protest in this court on February 21, 2003, requesting a judgment permanently enjoining the NIH from withdrawing the RFP as a small business set-aside and from awarding any contract for laundry services to anyone other than the plaintiff, declaring the actions of the CO at NIH to be arbitrary, capricious, and contrary to law, and awarding plaintiff its bid and proposal costs incurred in responding to the RFP.

On March 14, 2003, the government filed its motion for judgment upon the administrative record. The plaintiff responded on April 14, 2003. Oral argument was heard on April 25, 2003.[4]

## DISCUSSION

### A. Standard of Review

Motions for summary judgment upon the administrative record are treated in accordance with the rules governing motions for summary judgment. Rule 56.1 of the United States Court of Federal Claims; *Ceres Envtl. Serv., Inc. v. United States,* 52 Fed.Cl. 23 (2002); *JWK Int'l Corp. v. United States,* 49 Fed.Cl. 371, 387–88 (2001), *aff'd* 279 F.3d 985 (2002); *Redland Genstar, Inc. v. United States,* 39 Fed.Cl. 220, 230 (1997).

Where, as here, the action comes under the court's bid protest jurisdiction, the court is to review the agency's procurement related decision under the standards set forth in 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4). Deference to the CO decision is contingent upon an offering by the agency of a reasoned explanation for its decision which is in accord with material facts contained in the administrative record. *Y.S.K. Constr. Co. v. United*

*States,* 30 Fed.Cl. 449, 459 (1994); *see also Halter Marine, Inc. v. United States,* 56 Fed.Cl. 144, 159 (2003). Indeed, as the Federal Circuit has recently stated in connection with the Administrative Procedure Act review generally:

> "The Administrative Procedure Act, which governs the proceedings of administrative agencies and related judicial review, establishes a scheme of 'reasoned decisionmaking.' Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational." *Allentown Mack Sales and Service, Inc. v. National Labor Relations Bd.,* 522 U.S. 359, 374, 118 S.Ct. 818, 139 L.Ed.2d 797 [(1998)] ....

*In re Sang–Su Lee,* 277 F.3d 1338, 1342 (Fed.Cir.2002) (emphasis added).

Where the court finds that the agency does not provide an adequate basis for review, the court should not conduct a *de novo* review but should remand the matter for further agency consideration:

> If the record before the agency does not support the agency action, the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry.

*Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 84 L.Ed.2d 643 (1985); *See also Day & Zimmermann Serv. v. United States,* 38 Fed.Cl. 591 (1997).

### B. Positions of the Parties

The government argues that the CO's decision to withdraw the RFP was proper. The government argues that the CO correctly relied upon Tartan's price, the NNMC con-

---

4. The plaintiff also filed a motion to supplement the administrative record through expedited discovery on March 6, 2003. The government filed its opposition to that motion on March 10, 2003. The court denied the plaintiff's motion on March 18, 2003.

594

tract price, the Kramer study, and the IGE to find Nutech's price unreasonable. The government contends that each document or comparison is adequately supported and reflected in the Administrative Record. According to the government, Nutech's solicitation price, * * * * * that of Tartan's price, Nutech's NNMC contract and the IGE unit price, clearly exceeded the fair market value. Furthermore, the government argues that there is no evidence that any of the comparison prices are intrinsically irrational. The government finally argues that the CO followed correct administrative procedures, and received NIH–SBA approval to withdraw the solicitation from the small business set-aside program and conduct an unrestricted, full and open competition.

Nutech argues that the IGE was "unrealistic and understated and, thus, tainted" the CO's decision. Plaintiff's Opposition to Defendant's Motion for Judgment Upon the Administrative Record 11. The plaintiff argues that the Administrative Record lacks "any information to support the reasonableness of the NIH's IGE, how the NIH's IGE was derived, the data or cost/pricing information that was considered in arriving at the dollar figures ..., or even who prepared it." *Id.* at 12.

Nutech next argues that the CO improperly relied on the comparison of Nutech's proposal costs to Tartan's proposal costs when the Administrative Record fails to contain any analysis of the reasonableness of Tartan's claims after an initial and incomplete revision at the request of the CO. Nutech also argues that the CO failed to consider the differences between the RFP and its contract at NNMC, differences that were substantive enough to explain the disparities in the prices per pound for bulk linens. Nutech asserts that the CO should have considered Nutech's prior contract prices and the cost history associated with the contract.

Last, Nutech argues that the CO failed to comply with the appropriate regulations in withdrawing the solicitation from a small business set-aside. Nutech seeks to demonstrate that the CO misled Nutech during negotiations after he sought and obtained approval from the NIH–SBA to withdraw the solicitation. Nutech argues that the CO "failed to provide any written or verbal notification regarding his November 19, 2002 determination ...." *Id.* at 33.

## C. NIH Failed to Adequately Support its Decision on the Present Administrative Record

While the court is not prepared to reverse the CO decision and award the contract to Nutech, the court finds that it must remand the case to the CO to prepare a revised IGE that is well reasoned and supported by documentation. Once the revised IGE is prepared, the CO must then reevaluate his decision, in light of the new IGE, to determine whether the contract should be awarded to Nutech or if the new contract should be withdrawn from the small business set-aside program and re-solicited with unrestricted, full and open competition.

It is clear from the Administrative Record presented to the court, that the CO's present decision is not well-supported. First and foremost, the CO's reliance on the IGE is not supportable. The record contains a one-page IGE that is completely lacking in any notes or back-up documentation. It is accompanied neither by a description of cost figures upon which it is based nor the basis for arriving at the costs listed. A page with numbers and lacking any references is not an adequate IGE upon which to base a price decision.

While the court accepts that an IGE need not be supported with exhaustive details, the agency must be able to demonstrate the basis for the estimate, where as here, the analysis is questioned.[5] For example, in *Process Control Tech. v. United States,* 53 Fed.Cl. 71, 77 (2002), the court recently described a ten-page IGE as "extensive and detailed," which "'represent[s] the agency's best estimate of the most reasonable current price.'" In the present case, the administrative record does not reflect how the costs were derived. At

5. For example, Nutech charges that the IGE contains cost estimates for certain items such as tailoring services and inventory services are not consistent with wage determinations under the Service Contract Act. See AR 285–92, 526 and 738.

best, the record suggests that most of the information supplied for the IGE "has to do with the [Kramer] study results and market pricing." AR 829. As noted above, the Kramer report contained in the Administrative Record did not include any market price information and the market survey performed by NIH did not seek price information.

In *OMV Medical, Inc. v. United States,* 219 F.3d 1337 (Fed.Cir.2000), the Federal Circuit noted the importance of the CO being able to demonstrate the correctness of the factual basis for his or her decision. In *OMV Medical,* the Circuit questioned a suspect salary comparison between the incumbent contractor and a bidder. In rejecting the analysis provided by the CO, the Circuit stated that:

> [I]t is not necessary that [the analysis] be performed with impeccable rigor. The task of determining the minimum acceptable salary levels for the various positions was necessarily an exercise in approximation, and any assessment of the rationality of ... calculations must take into account the limited amount of information available to [the analyst]. Nonetheless, if [the] calculations were tainted by irrational assumptions or critical miscalculations, they may have been so useless as a basis for determining the minimum acceptable salary levels that [the] calculations tainted the bidding process.

219 F.3d at 1344.

Where, as here, the CO states that he relied upon the IGE to make his decision and there is no supporting documentation or discussion in the record regarding how the IGE was prepared, the court has no choice but to remand the matter to the CO for a new IGE.[6] Ultimately, the basis for the CO's decision must be transparent. Without any explanation in the record or this litigation to address the concerns raised by Nutech regarding the validity of the IGE, the court cannot determine if the IGE contains "irrational assumptions," nor can it determine if Nutech's price is unreasonable. *See Overstreet Elec. Co., Inc. v. United States,* 47 Fed.Cl. 728, 742 (2000) ("Here it is impossible to establish a rational connection between the administrative record and the Corps contention that it included subcontractor overhead and profit in its estimate."). Similarly, without a supported IGE, the court cannot be sure that the CO's conclusions regarding the reasonableness of the Tartan price and of the NNMC contract are rational.

In these circumstances, a remand to the agency in order for the CO to prepare a new and supported IGE and to reevaluate Nutech's offer in light of this new IGE is the appropriate remedy. *See Fla. Power & Light Co.,* 470 U.S. at 744, 105 S.Ct. 1598 ("If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").[7]

## CONCLUSION

The matter is hereby **REMANDED** to NIH in order for NIH to undertake a new IGE that reflects the methods and data used to determine its cost estimates and for NIH to then re-evaluate Nutech's proposal based on its revised IGE, as well as its decision to withdraw the RFP from the small business

---

6. At the oral argument on the plaintiff's motion for injunctive relief, government counsel conceded that the CO did not receive or review any of the data that went into creation of the IGE.

7. Nutech has asked the court to also order the CO to consider the prices under Nutech's existing NIH contract on remand, and to require the CO to conduct a more comprehensive comparison of the pending RFP and Nutech's NNMC contract. The court declines to do so. The fundamental problem in this case was the failure of the agency to prepare a supportable IGE. Whether a new IGE leads the CO to conclude that the prices Nutech charges on its current NIH contract are relevant is a matter the court will leave to the CO. Similarly, to the extent the CO finds that Nutech's NNMC contract is relevant to its IGE analysis, he should make sure that he has accounted for differences between the subject RFP and the NNMC contract. However, the court leaves it to the CO to make that determination in the first instance.

set aside program.[8] Accordingly, the plaintiff's April 14, 2003 cross-motion for summary judgment is hereby **GRANTED** to the extent provided for in this order. The defendant's March 14, 2003 motion for judgment on the administrative record is hereby **DENIED**. NIH shall be **ENJOINED** from finalizing action on the subject RFP pending the outcome of the remand.[9] Once NIH has completed these tasks it shall notify the court in writing and provide the court with a copy of the new and complete IGE, together with a copy of the CO's re-evaluation decision.

The parties are directed to submit to the court by **Wednesday, May 28, 2003**, their requests for redaction of protected/privileged material before the court issues its published order. The parties shall submit a courtesy copy of these requested redactions to the court via email to the following address: firestone_chambers@ao.uscourts.gov.

**IT IS SO ORDERED.**

---

8. In light of the remand decision, Nutech's objections to NIH's compliance with the procedures regarding its decision to withdraw the solicitation from the small business program are moot.

9. The court's order enjoining the NIH from finalizing action on the RFP moots plaintiff's February 21, 2003 motion for preliminary injunction.