**OVERSTREET ELECTRIC COMPANY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 00–314C.**

United States Court of Federal Claims.

Filed under seal: Aug. 16, 2000.

Published: Oct. 6, 2000 [1].

1. This opinion was issued under seal on August 16, 2000. The parties were given an opportunity to propose redactions; however, no such redactions were suggested and, therefore, the opinion is now published in original form.

Michael F. Kiely, U.S. Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General David W. Ogden, for defendant.

## OPINION

ALLEGRA, Judge:

This pre-award bid protest action is before the court on the parties' cross-motions for judgment on the administrative record. At issue is whether defendant acted arbitrarily and capriciously, and contrary to law, in rejecting plaintiff's low bid because it found the price unreasonable. After careful consideration of the briefs filed by the parties, the oral argument, and for the reasons discussed below, the court GRANTS plaintiff's motion for judgment on the administrative record and DENIES defendant's motion for judgment on the administrative record. The court further concludes that plaintiff is entitled to injunctive relief as described below.

## I. Facts [2]

On December 6, 1999, defendant, through the Louisville District of the Army Corps of Engineers (the Corps), issued IFB No. DACW27–00–B–0002, which invited sealed bids for a construction project consisting of the rehabilitation of pump stations located on the Little Calumet River in Lake County, Indiana. The solicitation envisioned that the awardee would purchase and have installed the large pumps and piping that form the heart of these facilities, as well as rehabilitate and replace such varied items as electrical wiring, ladders, hoists, floor plates and fencing. The solicitation anticipated that a significant portion of this work would be subcontracted.

The solicitation provided that the project was a "100 per cent set aside for small business" and established a bid opening date of January 5, 2000. On December 23, 1999, the Corps issued Amendment 0001 to the IFB, which changed the contract completion time from 900 to 700 calendar days and made changes to the specifications and drawings.

Michael H. Payne, Starfield & Payne, Fort Washington, PA, attorney of record for plaintiff.

2. The facts upon which this opinion is based are drawn from the administrative record; the affidavits attached to the briefs filed by the parties; and a supplemental affidavit filed by the defendant in response to an order by the court.

On December 27, 1999, the Corps issued Amendment 0002, which added two drawings that had previously been omitted from the solicitation. Three sealed bids were submitted in response to the IFB and were opened on January 5, 2000. Plaintiff, Overstreet Electric Company, Inc., submitted the low bid of $4,638,400; HRP Construction, Inc. submitted a bid of $4,773,545; and Kovilic Construction submitted a bid of $4,827,770.

The Corps' original estimate of the cost of the Little Calumet project, without profit, was $2,915,265. Plaintiff's low bid exceeded this estimate by 59.1 per cent. After the bid opening, the Corps determined that an upward correction of its estimate was appropriate and increased its estimate to $3,510,910.[3] Plaintiff's low bid still exceeded the revised Corps' estimate by 32.1 per cent. On February 2, 2000, the Corps issued its "Findings and Determination with Respect to Unreasonable Prices," which explained that all bids would be rejected as excessive and that the IFB would be converted to a negotiated procurement pursuant to Federal Acquisition Regulations (FAR) §§ 14.404–1(c)(6), (e)(1), and (f).[4] On February 9, 2000, the Corps amended the solicitation by issuing Amendment 0003, which notified the three bidders that the IFB was being converted to a negotiated procurement. Amendment 0003 noted, in pertinent part:

> [In accordance with] FAR 14.404.1(c)(6) 'Cancellation of Invitations After Opening,' all bids are hereby rejected and the subject solicitation is hereby converted to a negotiated procurement. All otherwise acceptable bids received were at unreasonable prices. All bidders are given opportunity to participate in negotiations. The award will be made to the responsible bidder offering the lowest negotiated price.

Plaintiff filed a protest with the General Accounting Office (GAO) on February 15, 2000. In responding to the GAO protest, the Corps indicated that it had rejected the offers based not only on FAR § 14.404.1, but also 33 U.S.C. § 624 (1994). Under the latter section, the Corps is prohibited from awarding a contract for river and harbor improvements if it "determines that the contract price [offered] is more than 25 per centum in excess of what [the Corps] determines to be a fair and reasonable estimated cost of a well-equipped contractor doing the work." 33 U.S.C. § 624(a)(2). The GAO denied plaintiff's bid protest on May 12, 2000, concluding that "from our review of the protester's specific allegations challenging the revised government estimate and the agency's detailed responses, we cannot find the revised government estimate to be materially understated or developed in a manner inconsistent with applicable regulations." *Overstreet Electric Co., Inc.*, B–284691, 2000 WL 621308, at *3 (Comp.Gen. May 12, 2000).

Plaintiff filed this pre-award bid protest on May 25, 2000, seeking a temporary restraining order, a preliminary injunction, and a permanent injunction enjoining the Corps from converting the IFB to a negotiated procurement and from awarding a contract to anyone other than plaintiff as the lowest bidder. The Corps agreed to suspend action on the procurement until August 18, 2000, while the court resolves the pending suit. Based upon this agreement, plaintiff withdrew its request for the temporary restraining order and preliminary injunction. On July 31, 2000, oral argument was conducted on the parties cross-motions for judgment on the administrative record.

## II. Discussion

### A. Legal Background

 In a bid protest case filed pre-award, this court will enjoin performance of

---

**3.** The revised estimate took into account new quotes on several major items. The prices on these items increased by approximately 25 percent, allegedly because suppliers became aware of the specifications and costs of some of the components of the pumps, including the motors. The original quotes on these items were obtained during the design phase of the project and were not updated during the bidding process. In addition, the original estimate failed to include subcontractor overhead and profit, which was allegedly added to the revised estimate.

**4.** As will be described in greater detail below, these provisions essentially authorize an agency to cancel an IFB if it finds, *inter alia,* that "all otherwise acceptable bids are at an unreasonable price." 48 C.F.R. § 14.404–1(c)(6).

the contract only where the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (1994). *See also* 28 U.S.C. § 1491(b)(4) (Supp. III 1997).[5] Regarding this standard, which is drawn from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994), the Supreme Court has stated:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). *See also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057–58 (2000);

*Blount, Inc. v. United States*, 22 Cl.Ct. 221, 227, 1990 WL 210734 (1990).[6] Accordingly, this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir. 1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir. 1983)).

■■■ It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's decision or that the challenged agency decision involved a clear prejudicial violation of applicable statutes and regulations. *See Seattle Security Services, Inc. v. United States*, 45 Fed.Cl. 560, 566 (2000); *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 42 (1997); *Aero Corp. v. United States*, 38 Fed. Cl. 739, 749 (1997). Further, "to prevail in a protest the protestor must show not only a significant error in the procurement process, but also that the error prejudiced it." *Data General Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996). To demonstrate prejudice, "the protestor must show 'that there was a substantial chance it would have received the

---

5. Plaintiff also alleges that the defendant's actions breached an implied-in-fact contractual obligation of the government to consider and treat all bids fairly. However, such a breach no longer *is the trigger for injunctive relief in this court.* In 1996, Congress amended the Tucker Act, 28 U.S.C. § 1491, to grant the Court of Federal Claims jurisdiction to entertain pre- and post-award bid protest actions. *See* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874–75 (1996) (ADRA). Prior to this amendment, this court had jurisdiction to decide pre-award bid protest actions under the theory that by soliciting bids the government impliedly entered into a contract to consider all bids in a fair and honest manner. *See W & D Ships Deck Works, Inc. v. United States*, 39 Fed.Cl. 638, 640–41 (1997); *Graphic-Data, LLC v. United States*, 37 Fed.Cl. 771, 778 (1997). This analysis derived from the fact that the controlling statute gave this court jurisdiction to afford complete relief on any "contract claim" brought before a contract was awarded. 28 U.S.C. § 1491(a)(3) (1994). Under the 1996 amendments to the Tucker Act, which repealed the prior version of section 1491(a)(3), this court's injunctive jurisdiction neither depends nor focuses upon whether a contract of fair dealing was breached. *See The Ryan Co. v. United States*, 43 Fed.Cl. 646, 656 (1999); *Ramcor Servs. Group, Inc. v. United States*, 41 Fed.Cl. 264, 268

(1998) ("The 1996 Tucker Act amendments obviate such a requirement.").

6. By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). The Supreme Court burnished these twin requirements in *Motor Vehicle Mfrs. Ass'n of the United States v. State Farm Ins. Co.*, 463 U.S. 29, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983), identifying four grounds upon which a holding of arbitrary and capricious agency action could be based. The Court stated:

> [I]f the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* at 43, 103 S.Ct. 2856. *See also OMV Medical, Inc. v. United States*, 219 F.3d 1337, 1343 (Fed. Cir.2000).

contract award but for that error.'" *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed.Cir.1999) (quoting *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1582 (Fed.Cir.1996)). Finally, because injunctive relief is so drastic in nature, the plaintiff must demonstrate its right to injunctive relief by "clear and convincing evidence." *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522, 1991 WL 15601 (1991). *See also Seattle Security Services,* 45 Fed.Cl. at 566.

Motions for judgment on the administrative record are reviewed under the same standards as motions for summary judgment. *See* RCFC 56.1(a); *Hoskins v. United States,* 40 Fed.Cl. 259, 270 (1998). Summary judgment is an integral part of the federal rules; it is designed 'to secure the just, speedy and inexpensive determination of every action.' *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 1). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Hunt v. Cromartie,* 526 U.S. 541, 549, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A motion for summary judgment on the administrative record is often an appropriate vehicle to scrutinize an agency's procurement actions because the issues in such cases typically involve contractual and regulatory interpretation, thereby presenting no genuine issues of material fact. *Analytical & Research Tech., Inc.,* 39 Fed.Cl. at 43.

### B. Were the Actions of the Contracting Officer Arbitrary and Capricious?

■ According to a leading treatise, "[c]ancellation of a procurement after bid opening is a serious matter because it can give bidders an unfair advantage if they are later permitted to recompete with knowledge of the prior bids." John Cibinic, Jr. and Ralph C. Nash, Jr., Formation of Government Contracts 636 (3d ed.1998). *See also Massman Construction Co. v. United States,* 102 Ct.Cl. 699, 60 F.Supp. 635, 643 (1945). Recognizing this, section 14.404–1(a)(1) of the

FAR provides that "[p]reservation of the integrity of the competitive bid system" dictates that once bids have been opened pursuant to an IFB, an "award must be made to that responsible bidder who submitted the lowest responsive bid, unless there is a compelling reason to reject all bids and cancel the invitation." 48 C.F.R. 14.404–1(a)(1). One compelling reason to cancel an IFB is if the agency head determines that "[a]ll otherwise acceptable bids received are at unreasonable prices." 48 C.F.R. 14.404–1(c)(6). *See also Bean Dredging Corp. v. United States,* 19 Cl.Ct. 561, 565, 1990 WL 12226 (1990). Regarding such a determination, this court has stated:

> The authority vested in the contracting officer to decide whether to cancel an IFB and readvertise is extremely broad. A determination concerning the unreasonableness of the prices bid is a matter of administrative discretion which should not be questioned unless the determination is shown to be unreasonable or that there is a showing of fraud or bad faith.

*Caddell Construction Co. v. United States,* 7 Cl.Ct. 236, 241 (1985). *Accord In re Gott Corp.,* 86–2 CPD ¶ 154 ("[s]uch a determination is a matter of administrative discretion which we will not disturb unless it is clearly unreasonable or there is a showing of bad faith or fraud on the part of the contracting officer").

■ While an agency may consider various factors in assessing price unreasonableness, this court has stated that "[i]n determining whether a bid reflects an unreasonable price, a comparison with Government estimates is an acceptable means of making that determination." *Kinetic Structures Corp. v. United States,* 6 Cl.Ct. 387, 395 (1984). *See also Cottrell Engineering Corp.,* 91–1 CPD ¶ 498 ("[a] determination that a bid is unreasonably high may properly be based on comparisons with government estimates, past procurement history, current market conditions, or any other relevant factors."). *Accord Sigma West Corp.,* 92–2 CPD ¶ 31. Indeed, the GAO has held that an agency may deem that prices are unreasonable "based only on a comparison of the government

estimate with the price received," even when "the bids are close in price." *G. Marine Diesel Corp.*, 90–1 CPD ¶ 515.[7] *See also Howard W. Pence, Inc.*, 97–2 CPD ¶ 150 ("A determination that a price is unreasonable may be based upon a comparison with the government estimate."); *J. Morris & Assocs., Inc.*, 94–2 CPD ¶ 47 (same); *Hawkins Builders, Inc.*, 90–1 CPD ¶ 154 (same); *Metric Constr., Inc., et al.*, 88–1 CPD ¶ 311 (same).[8] Accordingly, at issue in this case is whether the estimate used by the Corps to make the unreasonableness determination considered relevant factors and was otherwise rational.[9] In order for the estimate to be rational, "it is not necessary that it be performed with impeccable rigor," but it must not be "tainted by irrational assumptions or critical miscalculations." *OMV Medical*, 219 F.3d 1337, 1343–44.

The Corps may also determine that a bid price is unacceptable under 33 U.S.C. § 624(a)(2), which provides, in pertinent part: "[n]o works of river and harbor improvement shall be done by private contract ... [where] the contract price is more than 25 per centum in excess of what [the Chief of Engineers] determines to be a fair and reasonable estimated cost of a well-equipped contractor

doing the work." 33 U.S.C. § 624(a)(2). *See also Cottrell Engineering Corp.*, 91–1 CPD ¶ 498 (describing the statutory mechanism); S.Rep. No. 950722, 1978 U.S.C.C.A.N. 652 (describing the purpose of this statute). Section 624(c) clarifies the procedures for establishing the government's estimate, stating:

> In determining a fair and reasonable estimated cost of doing work by private contract under subsection (a)(2), the Secretary of the Army, acting through the Chief of Engineers, shall, in addition to the cost of labor and materials, take into account proper charges for depreciation of plant, all expenses for supervision, overhead, workmen's compensation, general liability insurance, taxes (State and local), interest on capital invested in plant, and such other expenses and charges the Secretary of the Army, acting through the Chief of Engineers, determines to be appropriate.

33 U.S.C. § 624(c). Tracking this statutory mechanism, section 36.205 of the Engineering Federal Acquisition Regulation Supplement (EFARS) states that "no civil works construction contract shall be awarded if the contract price exceeds the Government estimate prepared in accordance with [EFARS] 36.203–100 by more than 25 percent." [10]

---

7. Although decisions of the GAO are not binding on this court, they can be used for guidance when they are found to be reasonable and persuasive. *CACI Field Servs. v. United States*, 13 Cl.Ct. 718, 731 n. 28 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988).

8. Notably, while section 15.404–1(b)(2)(i) of the FAR indicates that price analysis may be accomplished by comparing the proposed prices received in response to the solicitation, the regulation also indicates that the Government has discretion in choosing which of several acceptable price analysis methods to employ, including "[c]omparison of proposed prices with independent Government cost estimates," *id.* at § 15.404–1(b)(2)(v). *See also* 1B John Cosgrove McBride & Thomas J. Touhey, *Government Contracts* (hereinafter "McBride and Touhey") § 10.20[4] (2000) ("a good indicator that the prices offered are unreasonable is a material variance from the government's estimate of what a procurement should cost").

9. Plaintiff argues that the best evidence of the reasonableness of its price is that it was the lowest of three bids relatively clustered together. While market conditions may be used in determining price reasonableness, *see* Cibinic & Nash,

*supra* at 644, the fact the bids submitted were higher than the estimate, without more, does not establish that plaintiff's price was reasonable. *See RNJ Interstate Corp.*, 91–1 CPD ¶ 219 ("the mere fact that prices bid are substantially higher than the government estimate does not, in and of itself, demonstrate that the government estimate is unreasonably low"). *See also* McBride & Touhey, § 10.20[4] ("Generally, the fact that all responsive bids exceed the government's estimate is not itself sufficient to establish the reasonableness of the bidder's prices and the unreasonableness of the government's estimate."). Plaintiff has failed to provide any further evidence in support of this argument.

10. In this regard, Section 36.203–100(c) of the EFARS provides:
 > Government estimates shall be based on fair and reasonable estimated cost of a well-equipped contractor doing the work. Proper charges for labor and materials, plant depreciation, all expenses for supervision, overhead, worker's compensation, general liability insurance, and interest on capital invested in plant shall be taken into account. An allowance for profit shall not be included.
 The Corps of Engineers has also promulgated Engineer Regulations (ER) and Engineering In-

In the instant case, defendant determined that the price in plaintiff's low bid was unreasonable and it canceled the solicitation, converting it to a negotiated procurement. To be sure, if an IFB is properly canceled due to unreasonable bid prices (or other compelling reasons), the agency may complete the acquisition through negotiation. 48 C.F.R. 14.404–1(e)(1) and (f).[11] Plaintiff, however, argues that the Corps erred in rejecting its low bid as including an unreasonable price, alleging that determination was based on an inadequate estimate of the project that materially understated its costs. Plaintiff alleges that the Corps' estimate failed to include a number of mandatory cost items required by the contract specifications and the Corps' own regulations. In this regard, plaintiff cites seven distinct cost items that it believes the Corps either undervalued or failed to take into account in its estimate, contending that the Corps actions were not in accordance with law, inconsistent with the solicitation and contrary to the Corp's own promulgated criteria. Plaintiff contends that if these items were properly reflected, the estimate would have been substantially higher, lessening the difference between it and the plaintiff's bid and obliging the Corps to award plaintiff the contract.[12] The court will analyze these seven items seriatim.

1. **Unreasonable home office overhead rate for a small business set aside procurement.**

Plaintiff first contends that the Corps, in its estimate, greatly understated the amount of general home office overhead (also known as general and administrative expenses or, simply, G & A). Both the Engineering Reg-

ulations and the Engineering Instructions define such overhead as those expenses "incurred by the contractor in the overall management of business, associated with all costs at the home office." ER 1110-2-1302, Appendix D, ¶ 8e; EI 01D010, § 10–3. According to Appendix D, examples of home office overhead include: "(1) Main office building, furniture. (2) Management and office staff, estimators. (3) Utilities. (4) Communications and travel. (5) Supplies. (6) Vehicles. (7) Business Insurance. (8) Taxes." ER 1110-2-1302, Appendix D, ¶ 8e.[13] The Engineering Instructions explain how to determine this amount, stating:

Of all the categories of costs, the contractor's G & A costs are the least definable. Each contractor organizes its company differently from any other. Each incurs costs differently from varying sources and manages operations of that home office by its own methodology. It is important to understand that home office costs are not standard and fixed. Even though the cost for a specific contractor varies from period to period, a rate is normally averaged as a computation of total home office costs over a sufficient period divided by the total volume of business during that specific period. This rate computation methodology allows distribution and projection to future project estimates. When more specific data is not available, the cost engineer may include empirical rates. **Empirical G & A rates typically range from three percent for large contractors to ten percent for small contractors.** Home office costs are typically included in the estimate of overhead as the product of an average experi-

structions (EI) regarding estimation procedures. Appendix D to ER 1110-2-1302 (1994) (Appendix D), as well as EI 01D010 (1997), provide detailed guidance regarding the preparation of cost estimates.

11. Where cancellation of an IFB due to unreasonable prices "is in accord with the governing legal requirements, the agency does not create an impermissible auction" by converting the IFB to a negotiated procurement. *Hawkins Builders, Inc.*, 90–1 CPD ¶ 154 (citing *Metric Constr., Inc., et al.*, 88–1 CPD ¶ 311). *Accord J. Morris & Assocs., Inc.*, 94–2 CPD ¶ 472.

12. Simple mathematics suggests that if the Corps' estimate is increased by $199,810, that is, to $3,710,720, then plaintiff's bid of $4,638,400 would be within 25 percent thereof.

13. *See also Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058 (Fed.Cir.1993) (describing similar examples of home office overhead); *C.B.C. Enterprises, Inc. v. United States*, 978 F.2d 669, 672 (Fed.Cir.1992) (same); *Capital Electric Co. v. United States*, 729 F.2d 743, 746 (Fed.Cir.1984) (same).

enced percentage rate times the expected contract amount.

EI 01D010, § 10–3.b (emphasis added).

Plaintiff argues that because the subject procurement is a "100% set aside for small businesses," defendant should have applied the 10 percent empirical rate attributable to small businesses in estimating home office overhead costs for this contract. Instead, defendant applied a 2 percent overhead rate, which is less than the empirical rate deemed typical for large contractors in the Corps' Instructions. Plaintiff concludes that by failing to apply the appropriate home office overhead rate, defendant's cost estimate was unreasonable, arbitrary and capricious. Defendant counters by stating that the Corps' cost estimator for this project, Gerald A. Brewer, applied a 2 percent overhead rate because a large amount of the contract work on this project is either to be performed by subcontractors or involves the procurement of materials. In his declaration, Mr. Brewer further indicated that he "included 2% of home office overhead within the estimated rate of 15.8 per cent ($289,242) for all of the prime contractor's overhead costs, in addition to allowing the prime contractor 10 per cent ($126,116) as overhead on subcontractor work."

Defendant's explanation of how the Corps calculated the general home office overhead in its estimate reveals several serious flaws. First and foremost, it appears that the estimator confused the concepts of home office overhead and job overhead. Job overhead costs "are those costs at the project site which occur specifically as a result of a particular project." In considering them, it is thus appropriate to focus on particular contract-related activities and whether they generate more or less work and cost for the contractor. By comparison, home office overhead costs are "incurred despite construction inactivity on a project," and "are not attributable to one contract in particular but arise because of general operations." *West v. All State Boiler, Inc.*, 146 F.3d 1368, 1372 (Fed.Cir.1998) (quoting *Interstate Gen. Gov't Contractors, Inc.*, 12 F.3d at 1058).[14] Unlike job overhead costs, home office overhead expenses exist whether or not particular activities are being conducted under a contract at all or at any particular time. *See C.B.C. Enterprises, Inc.*, 978 F.2d at 672 ("Conventional wisdom has it that such costs cannot, by their nature, be specific and traced to any particular contract"). "It is therefore necessary to allocate them to specific contracts on some fair basis of proration," which is sometimes done by comparing or estimating the ratio of particular contract billings to total billings for the period of performance. *In Eichleay Corp.*, 60–2 B.C.A. ¶ 2688, 1960 WL 538.[15] Consis-

---

**14.** *See also Altmayer v. Johnson*, 79 F.3d 1129, 1132 (Fed.Cir.1996) ("Home office overhead costs are those that are expended for the benefit of the whole business, which by their nature cannot be attributed or charged to any particular contract"); *Wickham Contracting Co., Inc. v. Fischer*, 12 F.3d 1574, 1578 (Fed.Cir.1994) ("Home office costs, by their nature, cannot be traced to any particular contract"); *Capital Electric Co. v. United States*, 729 F.2d 743, 748 (Fed. Cir.1984) (Friedman, J., concurring) ("this type of overhead cannot be directly attributed to the performance of a particular contract, yet it is an essential part of the contractor's total cost of doing business").

**15.** These principles are well evidenced in a series of cases dealing with the issue whether a contractor is entitled to home office overhead during the period that contract performance is suspended. In one of these cases, *West v. All State Boiler, Inc.*, *supra*, the Federal Circuit held that a contractor was entitled to recover unabsorbed home office overhead costs for the period that was needed to complete performance of a con-

tract due to the government's suspension thereof. In so concluding, the Federal Circuit described the proper treatment of home office overhead in the following terms:

> The bid price of a government contract incorporates any anticipated expenses arising from the performance of that contract, such as construction wages and equipment rental, to be incurred by the contractor. These are direct costs, because they arise solely because of and are attributable directly to performance of a specific contract. In addition, a government contractor incurs indirect costs which are not attributable to one contract in particular but arise because of general operations. Indirect costs are usually those costs that are 'incurred despite construction inactivity on a project, such as home office overhead including accounting and payroll services, general insurance, salaries of upper level management, heat, electricity, taxes, depreciation.' . . . . A contractor recovers its indirect costs by allocating them on a proportionate basis among all of its contracts.

tent with these authorities, Appendix D provides that "[s]ince [home office overhead expenses] are not incurred for any one specific project, they must be apportioned to all the projects." ER 1110–2–1302, Appendix D, ¶ 8e. *See also West,* 146 F.3d at 1371 (contractor recovers home office overhead by "allocating them on a proportionate basis among all of its contracts"); *Capital Electric,* 729 F.2d at 748 (home office overhead is "an essential part of the contractor's total costs of doing business" and "[s]ome basis, therefore, must be found for allocating this total overhead among the various contracts in connection with which it is incurred").

Given these considerations, the fact that certain contracting activities may not occur due to the fact that a significant portion of a bid price relates to subcontracting or procurement is not a rational basis for reducing home office overhead costs. *See In re Allen M. Campbell Co.,* B–141,586, 1962 WL 2969 at *3 (Comp.Gen. April 25, 1962) ("Home office overhead is generally a fixed cost that will not fluctuate with the volume of construction work that is undertaken.") The defendant's Engineering Instructions but-

tress this view. They set forth a range of flat percentages that are not calibrated to the nature of the activities being conducted under a particular contract, but rather to the size of the businesses involved. The range established in the instructions—typically between 3 percent of the contract amount for large companies to 10 percent of the contract amount for small businesses—reflects an apparent assumption that a smaller business generally needs to recover more of its overhead expenses through a particular contract than does a larger business, which may be expected to have more contracts over which to spread such expenses. Consistent with this approach, it does not rationally follow that because the contract here envisions significant subcontracting and procurements that the prime contractor's home office expenses for items such as office space, senior management, utilities and taxes should be reduced.[16] Accordingly, the court finds that the estimate here was tainted by an irrational assumption and that the defendant's reliance thereupon was arbitrary and capricious.[17]

146 F.3d at 1372 (quoting *Interstate Gen. Gov't Contractors, Inc.,* 12 F.3d at 1058). *See also Altmayer v. Johnson,* 79 F.3d at 1132–33; *Luria Bros. & Co. v. United States,* 177 Ct.Cl. 676, 693, 369 F.2d 701 (1966). While these suspension cases are not directly on point, they are sufficiently analogous to teach that home office overhead is not calculated by reference to specific actions being taken by the contractor with respect to a particular contract, as was done erroneously by the estimator here.

16. In fact, the contract specification here envisions that the prime contractor will conduct substantial activities in supervising and supporting the subcontracting and conducting procurements. For example, the contract requires the prime contractor to exercise substantial efforts in coordinating activities, as well as in verifying and testing that the equipment being procured meets the contract specifications.

17. Further support for this conclusion is found in *Wickham Contracting Co., Inc., supra.* In that case, a government contractor argued that it was entitled to additional home office overhead during a suspension because a substantial portion of its home office activity was directed to the contract during the delay. In rejecting this claim, the Federal Circuit stated:

Wickham's argument fails for a fundamental reason—Wickham confuses direct and overhead costs. As the Board noted, overhead

costs benefit and are caused by the business as a whole, not any one project. Thus, overhead costs are never attributable to or caused by any one contract. Wickham's claim to "directly attributable" home office overhead is a non sequitur. If a cost is directly attributable to a contract, then it is a direct cost, not an overhead cost. . . . . Ordinarily, all home office expenses fall into the overhead category because the contractor must operate a home office in order to seek work and administer contracts whether or not he is performing a particular contract.

12 F.3d at 1578–79. The court used rent as an example of how these principles work, observing that "the Albany project did not cause 80% of the Wickham's home office rent even if 80% of the activity in that office related to the Albany project. . . . Because Wickham would have incurred the same or similar rental expense in any event, no portion of the rent is directly attributable to the Albany project." *Id.* at 1579. Accordingly, *Wickham Contracting* stands for the proposition that home office overhead expenses may not be increased due to more home office activities being conducted with respect to a particular contract. The same rationale suggests, conversely, that such expenses may not be reduced due to an assumption that less home office activities will occur under a particular contract.

Nor do the other allowances made by the estimator negate the likely understatement of home office overhead. Certainly, the understatement is not offset by the supposed 15.8 percent "overhead" that the estimator included on the prime contractor's work. This percentage, in fact, is potentially misleading as it does not represent a separate allowance added to the estimate, but, rather, is simply the result of adding together the allowances made by the estimator for home office overhead, job overhead, insurance and bond costs and dividing that total by the contract price. Focusing on the cost components of this 15.8 percent, it thus becomes immediately apparent that none of those items and the allowances made therefore would offset any shortfall in the home office overhead estimate caused by the error identified above.

However, the Corps, in fact, added an additional 10 percent of the subcontractor's costs into its estimate to account for prime contractor overhead on subcontract work. As described by Mr. Brewer in his supplemental affidavit, "[t]his rate of 10% represents an attempt by the Government estimate to capture all administrative costs of the prime contractor to monitor subcontractor work." While application of this 10 percent rate does increase the estimate, it is unclear from the administrative record whether this increase falls into the category of additional job overhead—relating to the supervision of specific tasks performed by the subcontractor—or additional home office overhead. At oral argument, defendant's counsel repeatedly indicated that this 10 percent was an element of job overhead—a contention seemingly inconsistent with the notion that it somehow offsets a shortfall in home office overhead. Even if this amount does represent additional home office overhead, it would likely not offset totally a shortfall in that category, as the 10 percent was not applied to the entire contract price, as is normally done in home office overhead calculations, but rather was applied only to the subcontractor portion of the price (41.3 percent of the total price).[18] Finally, any curative impact this 10 percent might have in offsetting shortfalls in the home office overhead estimate is further diminished by the fact that defendant argues that other potential shortfalls in the estimate (*e.g.*, the failure to itemize specifically certain costs for quality control) are also included within this same 10 percent allowance.

Based on the foregoing, the court concludes that the Corps must recalculate its estimate to include a proper percentage for home office overhead. Consistent with the Engineering Instructions and the case law, the empirical percentage selected should be commensurate with the size of the businesses of the likely bidders and be designed to allow those bidders to recapture a pro rata portion of their home office overhead costs. To the extent that this recalculation requires further adjustments in other items (*e.g.*, a recalculation of job overhead or prime contractor overhead on subcontract items), such adjustments may be made (and must be documented) by the Corps in recalculating its overall estimate.

## 2. Omission of Contractually Required Site Facilities and Utilities

Appendix D provides that "Job Overhead" costs "are those costs at the project site which occur specifically as a result of a particular project," and include "[t]emporary facilities, project office" and "[t]emporary utilities." ER 1110–2–1302, Appendix D, ¶ 8d. Plaintiff argues that defendant's cost estimate did not include any costs for site facilities or utilities, except for telephone service, even though the solicitation required the contractor to provide utilities, sanitation facilities, and field office and storage facilities. Plaintiff contends that inclusion of costs for temporary facilities and utilities for the 18

---

18. Had the Corps calculated home office overhead by multiplying 10 percent times the contract price (less the overhead) of $3,445,261, it would have assigned that item a value of $344,526. Instead, the Corps allegedly calculated home office overhead by applying a 2 percent figure to the contract amount, yielding $70,283, and then applying a 10 percent figure to the subcontractor portion of the contract ($1,261,160), yielding $126,160. Adding the latter two figures together results in $196,443, which is still $148,083 less than the potential home office overhead figure above of $344,526.

month duration of the contract work would increase the cost estimate by $9,000.

In his declaration, Mr. Brewer explained that he included no costs for job site facilities in his estimate because the project job sites were about five miles away from the Corps' resident offices and thus, the Corps would not need on-site facilities.[19] Mr. Brewer further stated that most of the contract work would be performed indoors in the pumping stations, and thus, the contractor's personnel would not need on-site trailers because they could set-up headquarters in the pumping stations.

A fair reading of the solicitation indicates that, contrary to plaintiff's claim, it does not require the contractor to provide temporary facilities. Rather, paragraph 1.4.2 of Section 01500 states:

> The Contractor shall provide and maintain administrative field office facilities **where approved**. Government office and warehouse facilities will not be available to the Contractor's personnel.

The solicitation thus did not require the contractor to establish separate temporary facilities, but, as the highlighted language indicates, only requires the contractor to establish field office facilities "where approved." In the instant case, that approval was for facilities located within the pumping stations. Appendix D clearly envisions that estimators will have substantial discretion in pricing the cost of temporary facilities, stating that "[s]pecific considerations must be evaluated for each project." ER 1110-2-1302, Appendix D, ¶ 8b. Plaintiff has not demonstrated that Mr. Brewer's exercise of this judgment was unreasonable, let alone arbitrary, capricious and contrary to law. Accordingly, given the limited standard of review here, plaintiff's claim regarding the temporary facilities must be rejected.[20]

### 3. Unreasonable Estimate of Quality Control Organization

Plaintiff next contends that the Corps' estimate understates the cost for quality control. The solicitation requires the contractor to maintain a "Quality Control Organization "on site and to identify a "Quality Control Systems Manager" to "be responsible for overall management of Contractor Quality Control and have the authority to act in all Contractor Quality Control matters for the Contractor." Under the solicitation, the Quality Control Manager is responsible for:

> (i) assuring compliance with procedures for scheduling, reviewing, certifying and managing submittals, including those of subcontractors, off-site fabricators, suppliers and purchasing agents;
>
> (ii) control, verification, and acceptance of testing procedures for tests of equipment to be installed;
>
> (iii) tracking preparatory, initial and follow-up control phases, and control verification, and acceptance of tests including documentation;
>
> (iv) tracking construction deficiencies from identification through acceptable corrective action; and
>
> (v) generating various reports showing compliance with the aforementioned requirements.

The solicitation also provides minimum requirements for the other Quality Control staff members, stating that "[t]he staff must be of sufficient size to ensure adequate quality control coverage of all work phases, work shifts, and work crews involved in the construction."

In its estimate, the Corps accounted for only one quality control individual, the Quality Controls Systems Manager, and estimated the cost of that individual as $18,000—$1,000 per month for 18 months. Plaintiff contends that this monthly rate of $1,000 for the cost

---

**19.** In a prior affidavit filed with the GAO, Mr. Brewer suggested that $6,900 had been included in the revised estimate for this expenditure. However, a review of the job overhead calculation in the revised estimate indicates that this earlier statement was erroneous and that Mr. Brewer's more recent statements, indicating that nothing was included for these facilities, are accurate.

**20.** Although Mr. Brewer's explanation does not explicitly address the provision of utilities, it appears that he viewed such utilities as also being available through the existing pumping stations. The court sees no basis for disturbing this conclusion.

of the Quality Control Manager is unreasonably low given the significant responsibilities of the position. Plaintiff believes that the monthly rate of $3,200 used for an office engineer, allegedly a position with similar qualifications, should have instead been applied. Plaintiff further argues that in preparing its cost estimate, defendant erred in failing to include any costs for the Quality Control staff, noting that such staff is required by the solicitation. Had the Corps properly taken these costs into account, plaintiff asserts, the estimate would have been increased by $39,600.

Defendant, for its part, responds by explaining that the $1,000 monthly rate included in the cost estimate was not meant to represent the "full-time costs of a quality control representative for the entire project." Rather, that figure was intended to represent "only the quality control effort necessary by the prime contractor to oversee its own work." Because a significant amount of the work would be subcontracted, Mr. Brewer's declaration explains that the prime contractor would not have to perform quality control continuously over the course of contract performance, "thereby reducing both the time and extent of the prime contractor's quality control efforts." Mr. Brewer further notes that the "estimated quality control costs with respect to the subcontractors' work are not represented here, but are included and calculated within the category of the prime contractor's overhead on subcontractors' costs, which the Corps estimated to be 10 per cent of the subcontractors' costs ($126,116)."

Again, this explanation has a decidedly hollow ring. The solicitation provides that the "contractor is responsible for quality control and shall establish and maintain an effective quality control system." In this regard, it indicates that the Quality Control Systems Manager is "responsible for overall management of Contractor Quality Control" and must be "on the site at all times during the construction." Any notion that this description does not include the work of subcontractors is dispelled by section 01451 of the solicitation, which states that "Contractor quality control is the means by which the Contractor ensures that the construction, **to include that of subcontractors and suppliers,** complies with the requirements of the contract." (Emphasis added.) The solicitation also indicates that the contractor is required to develop a "Quality Control Plan," to be executed by the Quality Control Systems Manager, to cover all "construction operations, both onsite and off site, **including work by subcontractors, fabricators, suppliers, and purchasing agents.**" (Emphasis added.) Thus, contrary to the Corps' assumption, the solicitation clearly requires the contractor to oversee quality control for the entire project, including the work of subcontractors and suppliers.

Defendant, however, contends that the costs associated with the Quality Control Manager and his or her staff that are not included in job overhead are included in the 10 percent prime contractor overhead on subcontractor costs. It is difficult to comprehend, however, how defendant can consistently maintain, on the one hand, that the Corps concluded that a full-time Quality Control Manager and staff were unnecessary and, on the other hand, now maintain that the costs associated with these individuals are already reflected in the estimate. Even if these costs were included in this 10 percent allowance, defendant also maintains that any erroneous diminution in the prime contractor's home office overhead is also remedied by the same 10 percent, making it questionable whether this figure can be stretched to remedy so many deficiencies.

In calculating other job overhead, the Corps listed individual tasks and personnel that were unrelated to specific work items in the solicitation and assigned costs thereto—in this itemization, however, the Corps assigned only $18,000 to the Quality Control Manager and explicitly indicated "$0" for seven listed quality control staff persons, including a construction engineer and various technicians. Consistent with the Engineering instructions, on remand, the additional quality control costs should also be itemized in job overhead, so as to clearly reflect the inclusion of a full-time Quality Control Manager and appropriate staff, as required by the solicitation.

### 4. Unreasonable Estimate of Job Management and Field Office Personnel

Plaintiff also contends that the contract specifications require job management and field office personnel to conduct a variety of tasks including: "shop drawing preparation, inspection of mechanical work, the employment of an erection engineer, the employment of either a Certified Industrial Hygienist or a Certified Safety Professional, the reporting and documentation requirements concerning lead abatement included by reference in the specifications and the documentation of the disassembly, inspection, rehabilitation and reassembly of the mechanical equipment." Yet, plaintiff states that defendant included only the cost of one field office employee, a General Superintendent, to perform those duties. Plaintiff argues that defendant should have added the cost of an engineer and a clerk to the field office personnel to accomplish the required tasks, which would increase the cost estimate by $86,400 (Engineer at $3,200, per month for 18 months and a Clerk at $1,600 per month, for 18 months). Defendant, relying on Mr. Brewer's declaration, responds that the Corps determined that only one supervisory employee was necessary based on its "understanding of a job of this size and type, including the number of workers to be supervised, the activities to be performed, and the size of the work areas."

Appendix D identifies two categories of labor costs. "Direct labor costs" are defined as base wages plus payroll taxes, fringe benefits, and overtime allowances paid by the contractor for personnel who perform a specific construction task. ER 1110–2–1302, Appendix D, ¶ 3a. In addition to the actual workers, generally included within this cost center are crew foreman who receive an hourly wage and are considered part of the direct labor costs. "Indirect labor costs" are wages paid to contractor personnel whose effort cannot be attributed to a specific construction task. *Id.* at ¶ 3b. Personnel such as superintendents, engineers, clerks, and site cleanup laborers may be included as indirect costs. Under the estimation procedures, direct labor costs are captured in particular items, while most indirect labor costs

are generally reflected in job overhead (or possibly home office overhead). *See West,* 146 F.3d at 1371.

In the instant case, the various tasks identified by plaintiff to be performed by job management and field office personnel, while not segregated, are, nonetheless, reflected in the job overhead calculation or have been allocated as a direct labor cost. For example, shop drawing preparation and provision for either a Certified Industrial Hygienist or a Certified Safety Professional, one of whose responsibilities would be to prepare reports on lead abatement, are expressly reflected in the Corps' job overhead estimate, which includes $18,000 and $900 for drawings and the cost of a Safety Engineer, respectively. The other activities that plaintiff ascribes to field office personnel are actually incorporated as direct labor costs associated with specific items. For example, the "inspection of mechanical work" and "the documentation of the dissassembly, rehabilitation and reassembly of mechanical equipment," are listed as specific tasks under Section 15100 of the Solicitation, entitled "Mechanical—Rebuilding of Pumps and Motors." These tasks thus would be performed by the laborers working on this item, whose direct labor costs would be allocated to that item and not reflected in job overhead. The same is true of tasks to be performed by an erection engineer, who, under the solicitation, is responsible for supervising the installation, adjustment, commissioning and field testing of the pumps and motors.

Based on the foregoing, the court finds that plaintiff's claim with respect to this item is not well-founded.

### 5. Unreasonable Limitation on Time of Performance

By amendment to the solicitation, the contract completion time was established as 700 calendar days. Further, defendant's revised cost estimate provided that the estimated construction time was 700 days. Plaintiff contends that because established contract performance time was 700 calendar days or approximately 23 months, defendant erred in basing many of its overhead cost estimates on a construction time of 18 months. By

adjusting the government estimate of overhead to a 23–month period instead of an 18–month period, plaintiff argues that the estimate would increase by $71,000.

Mr. Brewer explains that he estimated that this project would only entail 18 months of actual field work within the 700 day time frame. He notes that the established contract performance time includes down time "when no actual work would be performed on site, because the project would not be continuous, and there would be lead times required to procure materials needed for rehabilitating pumps." In his supplemental affidavit, he amplifies this explanation, stating:

> First, there are several 'lead times' associated with this project. The contractor must present to the Corps its submittals for the pumps, i.e., its specific proposals for accomplishing the work, before doing any significant work on site. The submittal process alone I estimate to take about two months. Concurrent with the submittal process, the contractor must also have several plans approved by the Corps, i.e., its environmental plan, safety plan, and quality assurance plan. These plans would require 30–45 days for approval. Consequently little work will be done on site for the first two months or so of performance. Finally, the pumps that must be purchased for this project must be specially manufactured. Therefore, during contract performance there will be significant "lead time" between the ordering and delivery of the pumps when work at those sites will be affected.

In addition, Mr. Brewer attributes the down time to public safety, noting that the "project is phased so that all the sites are not out of operation at the same time."

The items that the Corps estimated using an 18–month convention appear to involve job overhead, rather than home office overhead, and would appear to be sensitive to the "down time" concerns that Mr. Brewer has identified. Plaintiff has failed to show that the costs associated with these items would not be reduced due to down time. Accord-

ingly, the court finds that the Corps did not act arbitrarily or capriciously in using an 18–month convention to estimate certain costs.

### 6. Omission of Subcontractor Overhead and Profit

Plaintiff contends that although the Corps' regulations provide that the cost estimate should include subcontractor overhead and profit as costs to the prime contractor, there is no indication of charges for subcontractor overhead or profit in defendant's revised cost estimate. In his declaration, Mr. Brewer responds that plaintiff is incorrect because the government cost estimate does include a subcontractor overhead and profit of 25 percent. He notes that while "[t]his 25% is not shown in the Government's revised estimate, because that estimate is calculated according to line items in the bid, and there were no line items in the bid for subcontractors' overhead and profit," the 25 percent allotment for subcontractor overhead and profit is evidenced in the administrative record. Defendant further notes that the GAO observed that subcontractor overhead and profit were included in the estimate. *See Overstreet Electric Co., Inc.,* B–284691, 2000 WL 621308, at *3 (Comp.Gen. May 12, 2000).

In claiming that subcontractor overhead and profit were taken into account, Mr. Brewer relies on a chart in the administrative record that reflects $909,859 for subcontractor work and $1,137,323 for subcontracts including indirect costs, the latter number being 25 percent greater than the first. The chart, however, is dated December 10, 1999—before the revised estimate made following the opening of the bids—and thus appears to relate only to the original estimate. By defendant's own admission, there is no similar document in the record that reflects that subcontractor profit and overhead were added to the subcontractor direct costs in the revised estimate.[21] Indeed, at least somewhat inconsistent with Mr. Brewer's claim, one chart in the revised estimate states, without explanation, that subcontractor overhead and profit are "0.0%." Perhaps

---

21. Consistent with this observation, in his supplemental affidavit, Mr. Brewer indicates that "[t]he 25 [percent] mark-ups for subcontractor

work are not indicated separately within any documents in the administrative record."

the lack of corroboration for Mr. Brewer's claim that subcontractor overhead and profit were reflected could be overlooked were it not for a second problem, *to wit,* Mr. Brewer admits in his supplemental affidavit that, notwithstanding his claim that the December 10, 1999, chart evidences that overhead and profit were included in the revised estimate, the original estimate, to which that chart relates, did not include such subcontractor overhead and profit. Accordingly, the only document in the administrative record that supports defendant's claim that subcontractor profit and overhead have been accounted for is a chart relating to the original estimate that has not been updated and whose existence did not assure that these items were included in that original estimate.

While the arbitrary and capricious standard is highly deferential, "it is not a rubber stamp." *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n,* 59 F.3d 284, 290 (1st Cir.1995). It especially does not require this court to accept, in a Kierkegaardian leap of faith, bald assertions on a critical point that are not otherwise tied to the administrative record and that are at least in tension with, if not contradicted by, various aspects of that record.[22] To the contrary, the Supreme Court has stated that, under the arbitrary and capricious standard, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Insurance Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (*quoting Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). Only by "carefully reviewing the record and satisfying [itself] that the agency has made a rea-

soned decision" can this court "ensure that agency decisions are founded on a reasoned evaluation of the relevant factors." *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989). *See also Citizens to Preserve Overton Park,* 401 U.S. at 415–16, 91 S.Ct. 814. Here, it is impossible to establish a rational connection between the administrative record and the Corps's contention that it, in fact, has included subcontractor overhead and profit in its estimate. This supplies yet an additional reason for remanding this matter to the Corps for further explanation and, to the extent necessary, correction.

### 7. Correction of Insurance and Bond Costs

The defendant's estimate included a bond cost of approximately 1 percent of the contract price and an insurance cost of 2 percent thereof. Plaintiff states that if corrections are made to the cost estimate based upon the errors pointed out above, and this bond and insurance rate is applied to the corrected amount, defendant's cost estimate would increase. Defendant admits that the application of these costs is purely mathematical and that they would need to be recalculated if the underlying estimate increased. Based on the foregoing determinations, additional increases in bond and insurance costs are warranted.[23]

### C. Prejudice

 To prevail in a bid protest, the protester must show not only a significant error in the procurement process, but also that the error prejudiced it. As noted above, to demonstrate prejudice, the protester must show that "there was a substantial chance it would

---

**22.** *See Asarco, Inc. v. United States Envtl. Protection Agency,* 616 F.2d 1153, 1160 (9th Cir.1980) ("The court cannot adequately discharge its duty to engage in a 'substantial inquiry' if it is required to take the agency's word that it considered all relevant matters"). Defendant points to the fact that a second declaration from Mr. Brewer's supervisor states that Mr. Brewer is correct in asserting that subcontractor profit and overhead were included in the revised estimate. But, this declaration is summary in nature and neither indicates the basis upon which it was

derived nor points to any aspect of the administrative record in support thereof. The court, accordingly, finds this second declaration equally unpersuasive.

**23.** There is some dispute between the parties as to how bond costs were calculated in the revised estimate. On remand, the recalculation of bond costs should be performed consistent with the methodology prescribed by paragraph 10 of Appendix D.

have received the contract award but for th[e] error." *Alfa Laval Separation, Inc.,* 175 F.3d at 1367. The Federal Circuit explained the underpinnings of this standard in *Data General Corp. v. Johnson,* 78 F.3d 1556 (Fed.Cir.1996). In that case, the court observed that:

> To establish prejudice, a protester is not required to show that but for the alleged error, the protester would have been awarded the contract. Such a rule would make it virtually impossible for a protester ever to prevail, no matter how egregious the error in the procurement process. On the other hand, a showing of a mere possibility that the protester would have received the contract but for the error is inadequate to show prejudice. If that were sufficient, the requirement of prejudice would be virtually eliminated. The proper standard lies between these polarities.

78 F.3d at 1562 (citations omitted). Reviewing various other formulations of what is necessary to show prejudice, the court ultimately concluded that "[w]e think that the appropriate standard is that, to establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract." *Id.*[24]

On this record, plaintiff has shown that the errors committed by the defendant prejudiced it because it has established that, without these errors, there was a substantial chance it would have been awarded the contract. Correcting the errors identified above has the potential to increase significantly the Corps's estimate and likely could bring plaintiff's bid price within 25 percent of that estimate. Should this happen, the Corps could determine that the plaintiff's bid price is reasonable and award the contract to it as the low bidder on the original solicitation. Although it is uncertain whether these various adjustments would have resulted in plaintiff receiving the contract, the standard

for prejudice adopted by the Federal Circuit and this court does not require such certainty. Rather, under the "substantial chance" doctrine, it appears that plaintiff has demonstrated that it was prejudiced by the errors identified above.

## III. Injunctive Relief

■■■ Having concluded that the Corps' estimate was materially flawed and that plaintiff was thereby prejudiced, the court must determine whether plaintiff has made three additional showings to warrant injunctive relief: (i) that it will suffer specific irreparable injury if the cancellation of the solicitation is not overturned and the negotiated procurement is not enjoined; (ii) that the harm to be suffered by it outweighs the harm to the government and third parties if the injunction were issued; and (iii) that granting the requested relief serves the public interest. *See ES–KO, Inc. v. United States,* 44 Fed.Cl. 429, 432 (1999); *Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239, 251 (1997), *aff'd,* 155 F.3d 566, 1998 WL 244202 (Fed.Cir.1998). No one factor is dispositive to the court's inquiry as "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States,* 3 F.3d 424, 427 (Fed.Cir.1993). Plaintiff bears the burden of proving it is entitled to preliminary injunctive relief by clear and convincing evidence. *See Delbert Wheeler,* 39 Fed.Cl. at 251; *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522, 1991 WL 15601 (1991). In the instant case, the existence of irreparable injury to plaintiff, the balancing of harms in favor of the plaintiff, and the public interest all lead this court to grant injunctive relief to plaintiff.

### A. Irreparable Injury

■■■ When assessing irreparable injury, "[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction."

---

**24.** The court further observed that this standard "reflects a reasonable balance between the importance of (1) averting unwarranted interruptions of and interferences with the procurement process and (2) ensuring that protesters who

have been adversely affected by allegedly significant error in the procurement process have a forum available to vent their grievances." 78 F.3d at 1563.

*Magellan Corp. v. United States*, 27 Fed.Cl. 446, 447 (1993). Plaintiff argues that it will suffer irreparable harm if an injunction is not granted because of the potential loss of valuable business on this contract. This type of loss, deriving from a lost opportunity to compete in a fair competitive bidding process for a contract, has been found sufficient to prove irreparable harm. *See United Int'l Investigative Servs., Inc. v. United States*, 41 Fed. Cl. 312, 323 (1998) ("[T]he opportunity to compete for a contract and secure any resulting profit has been recognized to constitute significant harm."); *Magnavox Elec. Sys. Co. v. United States*, 26 Cl.Ct. 1373, 1379, 1992 WL 277980 (1992) (same); *Bean Dredging*, 22 Cl.Ct. at 524 (bidder would be irreparably harmed because it "could recover only bid preparation costs, not lost profits, through an action at law").[25] Moreover, even if plaintiff were to receive the contract as the result of a negotiated procurement, it inevitably would obtain the contract only at a lower price, thereby significantly reducing its potential for profit. Accordingly, plaintiff has adequately demonstrated that it will suffer irreparable harm if injunctive relief is not provided.

### B. Balance of Hardships

Under this factor, the court must consider whether the balance of hardships leans in the plaintiff's favor. This requires a consideration of the harm to the government. The defendant, for its part, argues that immediately enjoining the award of the contract under a negotiated procurement would delay the rehabilitation of the pumping stations. However, "only in an exceptional case would [such delay] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests." *Ellsworth Associates, Inc. v. United States*, 45 Fed.Cl. 388, 399 (1999). This is not such an "exceptional case" as the delay in question is occasioned by defendant's own failure to employ a reasonable estimate. *See Bean Dredging Corp.*, 19 Cl.Ct. at 583. Moreover, defen-

dant's delay concern can be alleviated somewhat by constructing the injunction herein to minimize the delay in awarding the contract. In these circumstances, the balance of hardships tilts in the plaintiff's favor.

### C. Public Interest

It is beyond peradventure that the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid. *See Cincom Systems, Inc. v. United States*, 37 Fed.Cl. 266, 269 (1997); *Magellan*, 27 Fed.Cl. at 448. *See also Parcel 49C Ltd. Partnership v. United States*, 31 F.3d 1147, 1153 (Fed.Cir. 1994). Moreover, "a public interest is manifest in ensuring that the Government closely adhere to the requirements of the procurement regulations." *Scanwell Lab., Inc. v. Shaffer*, 424 F.2d 859, 866–67 (D.C.Cir.1970) "It is equally clear, however, that a procuring agency should be able to conduct procurements without excessive judicial infringement upon the agency's discretion." *Aero Corp. v. United States*, 38 Fed.Cl. 237, 242 (1997). *See also Magellan*, 27 Fed.Cl. at 448. In the instant case, the public's interest lies in preserving the integrity of the competitive bidding process and precluding defendant from converting this procurement into a negotiated one based upon an estimate that is manifestly flawed. Accordingly, the court finds that granting plaintiff's request for a permanent injunction would not be contrary to the public interest.

### IV. Conclusion

The court finds that the Corps acted in an arbitrary and capricious fashion in constructing the estimate that it used for assessing the reasonableness of the price in the plaintiff's bid and that the defendant's actions prejudiced the plaintiff. Accordingly, the court **GRANTS** plaintiff's motion for judgment on the administrative record and **DENIES** defendant's motion for judgment on

---

**25.** Support also exists for the proposition that the denial of the right to have a bid fairly and lawfully considered constitutes irreparable harm. *See Ellsworth Assocs., Inc. v. United States*, 45 Fed.Cl. 388, 398 (1999) (citing cases). *But see*

*Minor Metals, Inc. v. United States*, 38 Fed.Cl. 379, 381–82 (1997) (noting "economic harm without more, does not seem to rise to the level of irreparable injury").

the administrative record. In consideration of the above, **IT IS ORDERED:**

1. Because deriving and applying a corrected estimate requires, in the first instance, the Corps to exercise judgment, the most appropriate remedy here is to remand this matter to the Corps for: (i) a recalculation of the estimate here consistent with this opinion; (ii) a new set of findings and determination as to whether the price in the plaintiff's bid is reasonable in light of the new estimate; and (iii) if the price is determined to be reasonable, a decision whether to award the contract to plaintiff. *See* 28 U.S.C. § 1491(a)(2) (allowing this court "to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."). *See also Y.S.K. Const. Co., Inc. v. United States,* 30 Fed.Cl. 449, 459 (1994) (applying section 1491(a)(2) in a bid protest action).

2. The Corp's decision must set forth its rationale with clarity, and must be justifiable on that basis. *SEC v. Chenery Corp.,* 332 U.S. 194, 196–97, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947). It must also be rational, properly founded in the statutory authority granted by Congress and consistent with the promulgated regulations and instructions governing the estimation process. The court expects that, to meet this standard, the Corps will correct the errors identified herein.[26]

3. Pursuant to the authority granted this court by 28 U.S.C. § 1491(b)(2), in order to implement the remand in an orderly fashion, the Corps shall reinstate the original solicitation on this project and, consistent with that reinstatement, shall be prohibited from proceeding with any negotiated procurement or a new solicitation relating to the project in question, until further order.

4. The Corps shall make the determinations described above and report back to the court no later than September 29, 2000.[27]

5. This opinion shall be published as issued after October 2, 2000, unless the parties identify protected and/or privileged materials subject to redaction prior to said date.

6. Costs to the plaintiff.

---

26. The recalculated estimate should also remedy an additional error concerning the cost of a particular subcontractor item identified by Mr. Brewer in his supplemental affidavit.

27. The remand ordered herein obviates the necessity for this court to rule, at this juncture, on the issue whether, under 33 U.S.C. § 624, the Corps is required to award a contract if a bid price is less than 25 percent above its estimate. Defendant has argued forcefully that section 624 does not require such an award. However, this court will not prejudge this issue. If, following the remand, this issue resurfaces, this court will rule thereon expeditiously.